George GROUNDHOG et al., Plaintiffs-Appellants,

v.

W. W. KEELER et al., Defendants-Appellees.

No. 34–70.

United States Court of Appeals, Tenth Circuit.

May 5, 1971.

---

Stuart Trapp, Tahlequah, Okl., for plaintiffs-appellants.

Andrew C. Wilcoxen, Muskogee, Okl., and Earl Boyd Pierce, Ft. Gibson, Okl., for defendants-appellees W. W. Keeler, United Keetoowah Band of Cherokee Indians in Okl., and The Members of the Cherokee Executive Committee.

Dirk D. Snell, Atty., Dept. of Justice, (Shiro Kashiva, Asst. Atty. Gen., Dept. of Justice, Nathan G. Graham, U. S. Atty., Robert P. Santee, Asst. U. S. Atty., and Edmund B. Clark, Atty., Dept. of Justice, were with him on the brief), for Federal defendants-appellees.

Before LEWIS, Chief Judge, and PHILLIPS and JOHNSEN,[*] Circuit Judges.

PHILLIPS, Circuit Judge.

This is a declaratory judgment action brought by Groundhog, Blair, Guess, Tanner and Proctor,[1] descendants of enrolled citizens of the Cherokee Nation, against Keeler, who now holds, and since 1949 has held, the office of Principal Chief of the Cherokee Nation, Walter J. Hickel, as United States Secretary of the Interior, Virgil Harrington, Area Director of the Bureau of Indian Affairs in the Muskogee Area, and Day, Starr, Morton, Crawford, Masters, Chuculade, Johnson, Ballard and Mayes, members of the Cherokee Executive Committee, which was formed in 1948.

The Cherokees are one of the Five Civilized Tribes of Indians.

They were the largest and most important tribe of Indians originally east of the Alleghanies. Compared with other Indian tribes, they ranked high in culture and intellectual receptivity. Their high degree of civilization was probably due to their own inherent character and the fact that many of their purebloods intermarried with fine members of Scotch families, and pureblood Cherokees intermarried with half-blood or less than half-blood Cherokees. The admixture of Cherokee and white blood

---

[*] Of the Eighth Circuit, sitting by designation.

[1.] Hereinafter referred to collectively as the plaintiffs.

began long before the Revolutionary War.

Their Principal Chief for nearly 40 years (1828–1866) was John Ross, who was one-half-blood Cherokee and one-half-blood Scotch.

During the third decade of the 19th century, they adopted a constitution, organized a system of government, and adopted a code of laws.

In 1825, they invented a Cherokee alphabet of 85 letters, one for each sound in Cherokee. And in 1828, they began the publication of a Cherokee newspaper, one-half of which was printed in the Cherokee alphabet.

The Cherokees gradually migrated south and west, first into Virginia, the Carolinas, and Georgia, and later into Alabama and Louisiana. Still later, part of the Tribe crossed the Mississippi River, and by 1817 there were about 3,000 of them north of the Arkansas River in what later became Indian Territory.

In the Civil War, some Cherokees supported the Union and some the South. Each furnished a large body of troops to the chosen side.

Like most of the Indians located in the South, they kept slaves. After the Civil War ended, they freed their slaves and made them full members of the Cherokee Tribe. They were thereafter called freedmen.

In 1892, the Cherokees sold their western extension, known as the Cherokee outlet. Their occupied area, thereafter, was the whole of Indian Territory, later part of Oklahoma, north of the Arkansas River.

We have recited the above facts, taken from the Encyclopedia Americana, Vol. 6, pp. 415–417, to show that there were many part blood Cherokee members of the Tribe and to show the high degree of civilization the Cherokees attained.

Cherokee tribal existence continues by virtue of § 28, Act of April 26, 1906, 34 Stat. 137, 148. Such Act (§ 6) authorized the President to appoint a citizen by blood of the Cherokee Tribe as the Principal Chief of such Tribe. In 1949, the President appointed W. W. Keeler as Principal Chief of such Tribe. By Executive Order of June 7, 1951, No. 10250, 16 F.R. 5385, the power to appoint such Chief was delegated to the Secretary of the Interior. Since then, Keeler has acted as Principal Chief of the Cherokee Tribe by appointment of the Secretary of the Interior.

The defendants moved to dismiss the action for want of jurisdiction. The trial court sustained the motion on the ground that the controversies the plaintiffs sought to adjudicate arose out of intratribal disputes and were not within the jurisdiction of the federal courts.

Whether the federal district court had jurisdiction of the action must be determined from the allegations of fact in the complaint, without regard to mere conclusionary allegations of jurisdiction.[2] The allegations of the complaint necessary to be considered in determining the question of jurisdiction are set out in Appendix I to this opinion. We have omitted allegations to the same effect as those set out in Appendix I, where they were stated in slightly different verbiage.

We turn first to the plaintiffs' claim that the appointment of Keeler as Principal Chief of the Cherokee Tribe was illegal. The plaintiffs predicate that claim on two grounds:

1. That Congress had no power to authorize the President to appoint the Chief of the Cherokee Tribe, because so to do violated the Fifth and Fifteenth Amendments to the Constitution of the United States; and

2. That Keeler was not a citizen by blood of the Tribe and therefore was not

2. Simpson v. State of Utah, 10 Cir., 365 F.2d 185, 186;
Mosher v. City of Phoenix, 287 U.S. 29, 30, 53 S.Ct. 67, 77 L.Ed. 148;

Eastern Air Lines, Inc. v. Flight Engineers Internat'l Assn., 5 Cir., 340 F.2d 104, 105.

eligible for appointment as Chief of the Tribe.

■ The Indian nations or tribes are dependent political nations and wards of the United States. They possess the attributes of sovereignty, insofar as they have not been taken away by Congress. They are quasi-sovereign nations.[3] The Constitution applies to Indian nations only to the extent it expressly binds them or is made binding on them by treaty or Act of Congress.[4]

■ An Indian tribe or nation is not a federal instrumentality and is not within the reach of the Fifth Amendment, and due process restraint places restrictions on the Indian tribes only when it is so provided by Congressional enactment.[5]

■ However, it is well settled that Congress has exclusive and plenary power to enact legislation with respect to the Indian tribes.[6]

In Sizemore v. Brady, 235 U.S. 441, at 447, 35 S.Ct. 135, at 135, 59 L.Ed. 308, the court said:

" * * * Like other tribal Indians, the Creeks were wards of the United States, which possessed full power, if it deemed such a course wise, to assume full control over them and their affairs, * * *."

The Act of April 11, 1968, 82 Stat. 77, 25 U.S.C. §§ 1301, 1302, is commonly known as the Indian Bill of Rights. (We set out the text thereof in Appendix II to this opinion.)

It imposes restrictions on Indian tribes in the exercise of the power of self-government. It imposes no restrictions on the Congress in legislating with respect to Indian tribes, nor on the Secretary of the Interior in exercising the power given to him by Congress with respect to Indian tribes and their affairs. It should be noted that its language is much narrower than the language of the Fourteenth Amendment, and it omits entirely the suffrage provisions of the Fifteenth Amendment.

■ We conclude that the challenge to the constitutionality of that portion of the Act of April 26, 1906, supra, which authorizes the President to appoint as the Principal Chief of the Cherokee Tribe a citizen of the Tribe by blood, is so lacking in substance and so contrary to the well established law enunciating the power of Congress to legislate with respect to the Indian tribes and their affairs that it affords no substantial basis for a claim of federal jurisdiction under 28 U.S.C.A. § 1331(a), as a civil action which "arises under the Constitution * * * of the United States." [7]

---

3. United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894;
   Talton v. Mayes, 163 U.S. 376, 384, 16 S.Ct. 986, 41 L.Ed. 196;
   Choctaw and Chickasaw Nations v. Seitz, 10 Cir., 193 F.2d 456, 458;
   Maryland Casualty Company v. Citizens National Bank of West Hollywood, 5 Cir., 361 F.2d 517, 520;
   Native American Church of North America v. Navajo Tribal Council, 10 Cir., 272 F.2d 131, 134.

4. Native American Church of North America v. Navajo Tribal Council, 10 Cir., 272 F.2d 131, 135.

5. Martinez v. Southern Ute Tribe of Southern Ute Reservation, 10 Cir., 249 F.2d 915, 919;
   Talton v. Mayes, 163 U.S. 376, 384, 16 S.Ct. 986, 41 L.Ed. 196.

6. Winton v. Amos, 255 U.S. 373, 391, 41 S.Ct. 342, 65 L.Ed. 684;
   Williams v. Johnson, 239 U.S. 414, 420, 36 S.Ct. 150, 60 L.Ed. 358;
   Sizemore v. Brady, 235 U.S. 441, 447, 35 S.Ct. 135, 59 L.Ed. 308;
   Lone Wolf v. Hitchcock, 187 U.S. 553, 565, 23 S.Ct. 216, 221, 47 L.Ed. 299.
   In Lone Wolf v. Hitchcock, supra, the court said:
   "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. * * *"

7. California Water Service Co. v. City of Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 867, 82 L.Ed. 1323;
   Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152;

We turn now to the second ground upon which plaintiffs predicate the claim that Keeler's appointment as Principal Chief of the Tribe was illegal.

Whether the claim that W. W. Keeler's appointment was illegal, because he was not a citizen by blood of the Cherokee Tribe, is a matter of internal dispute over which the federal courts have no jurisdiction, we need not decide and do not decide. It may be noted in passing, however, that in the case of Martinez v. Southern Ute Tribe of Southern Ute Reservation, 10 Cir., 249 F.2d 915, this court held that the question of whether a person was a member of a tribe and whether he had the right to vote at the election of the tribal council was a matter of internal dispute, with respect to internal affairs of the tribe, and was not within the jurisdiction of a federal district court.

The Dawes Commission was provided for by the Act of March 3, 1893, 27 Stat. 612, 645, to negotiate tribal allotments with the Five Civilized Tribes, and by later legislation it was directed to enroll the members of such tribes. Enrollment criteria are set forth in § 21 of the Act of June 28, 1898, 30 Stat. 495, 502–503, as confirmed by § 27 of the Act of July 1, 1902, 32 Stat. 716, 720. The Act of June 28, 1898, 30 Stat. 495, at 503, declares that tribal enrollment, as completed by the Dawes Commission and approved by the Secretary of the Interior, has the effect of designating as tribal members the enrollees named therein, together "with their descendants thereafter born to them."

Plaintiffs do not challenge the validity of such provisions in the Act of June 28, 1898. In their complaint, plaintiffs allege only generally that W. W. Keeler

Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 77 L.Ed. 1062;
Regents of New Mexico College of Agriculture & Mechanic Arts v. Albuquerque Broadcasting Co., 10 Cir., 158 F.2d 900, 907.
In California Water Service Co. v. City of Redding, supra, the court said:

was not a citizen by blood of the Cherokee Tribe. They do not allege that he was not a citizen by blood of the Cherokee Tribe under the criteria laid down by the Congress, nor that he was not a descendant of parents, each of whom was a citizen by blood of the Cherokee Tribe under the criteria laid down by Congress and who were enrolled as such on the Rolls of the Cherokee Tribe, prepared by the Dawes Commission and approved by the Secretary of the Interior.

They apparently base the allegation on what they contend were the proper criteria for determining whether a person was of Indian blood, but they do not allege what they claim are the proper criteria.

In the case of Simmons et al. v. Eagle Seelatsee et al., D.C.E.D.Wash., 244 F. Supp. 808 (1965), the plaintiffs were children and grandchildren of Joseph Simmons, Sr., who at the time of his death on May 2, 1960, was a member of the Yakima Indian Nation and an enrolled member of the Yakima Tribes, and was then the owner of certain interests in Yakima Indian allotments on the Yakima Indian Reservation in the State of Washington.

The plaintiffs brought an action in the United States District Court for the Eastern District of Washington against Seelatsee, individually, and as Chairman of the Yakima Tribal Council of the Confederated Bands and Tribes of the Yakima Nation and against such Council.

The action involved the validity of § 7 of the Act of August 9, 1946, 60 Stat. 968, 25 U.S.C. § 607, which provided:

"After August 9, 1946, only enrolled members of the Yakima Tribes of one-fourth or more blood of such

" * * * The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject. * * * "

tribes shall take by inheritance or by will any interest in that part of the restricted or trust estate of a deceased member of such tribes which came to the decedent through his membership in such tribes or which consists of any interest in or the rents, issues, or profits from an allotment of land within the Yakima Reservation or within the area ceded by the treaty of June 9, 1855 (12 Stat. 951) * * *."

In their complaint, the plaintiffs alleged that notwithstanding under the laws of the State of Washington they were entitled to inherit such property of the decedent, they were denied their claim of heirship by the Secretary of the Interior on the ground of their inability to meet the requirement of "one-fourth or more blood" of the Yakima Tribes, as required by such § 7.

They further alleged that § 7 is unconstitutional for two reasons:

First, that it is wanting in due process because it bears no reasonable relation to the guardianship the United States has over Indians and that it restricts the free choice of Yakima enrollees in prospective spouses and confiscates the Indians' property; and

Second, that § 7 is unconstitutional because it is based on a criterion of race contrary to the provisions of the Fifth Amendment to the United States Constitution.

Because the constitutionality of § 7 was assailed, a three-judge court was assembled. The United States, acting through the Attorney General, intervened in the case, curing any absence of indispensable parties.

In an able, exhaustive, and well-considered opinion by the late Walter L. Pope, formerly a United States Circuit Judge of the Ninth Circuit, the court held:

That it was well settled that Congress has plenary control over Indian tribal relations and property, and that such power continues after such Indians have become citizens, citing Board of County Commissioners of Creek County v. Seber, 318 U.S. 705, 716, 63 S.Ct. 920, 87 L.Ed. 1094, and Brader v. James, 246 U.S. 88, 96, 38 S.Ct. 285, 62 L.Ed. 591;

That it was early held that such plenary power of Congress included the power to regulate and determine tribal membership, and in so doing to define and describe those persons who should be treated and regarded as members of an Indian tribe, citing Stephens v. Cherokee Nation, 174 U.S. 445, 488, 19 S.Ct. 722, 43 L.Ed. 1041.

After citing a number of instances where Congress had used the criterion of Indian blood in determining which Indians should, and which Indians should not participate in stated rights, assistance, privileges, and treatments, the court said:

"It is plain that Congress, on numerous occasions, has deemed it expedient, and within its powers, to classify Indians according to their percentages of Indian blood. Indeed, if legislation is to deal with Indians at all, the very reference to them implies the use of 'a criterion of race.' * * *"

It dismissed the action with prejudice.

On appeal, the United States Supreme Court summarily disposed of the case by a one-sentence per curiam opinion reading:

"The motions to affirm are granted and the judgment is affirmed." [8]

In the enrollment of the Cherokee Nation made by the Dawes Commission, approved by the Secretary of the Interior on or before March 4, 1907, and filed in the Bureau of Indian Affairs, Muskogee, Oklahoma, the following appears under:

"Dawes Roll No. 10354 Keeler, William Age 24 Sex M Blood 1/16"; under "No. 10355 Keeler, Lula Wife Age 20 Sex F Blood 1/16"; and under "No. 10356 Keeler Lela B. Dau. Age 13 mo. Sex F Blood 1/16". Under the heading, "Rela-

8. See Simmons et al. v. Eagle Seelatsee, Chairman of the Yakima Tribal Council, et al., 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480.

tionship to Person first Named" there appears after "Lula" the word "wife" and after "Lela B." the abbreviation "dau." indicating that Lula was the wife of William and that Lela was the daughter of William and Lula.

Along with the Roll in the office of the Bureau of Indian Affairs at Muskogee, Oklahoma, is an affidavit made, subscribed, and sworn to by Lela Blanch Keeler Adams on December 31, 1962. It avers that she is one of the heirs at law or legatees of Lula Keeler, a citizen of the Cherokee Tribe, Roll No. 10355; that said Lula Keeler departed this life on July 23, 1943; that affiant's parents were Mr. and Mrs. William Keeler; that they were never married to anyone else; that Lula Keeler did not leave a surviving husband; that affiant's brother, William W. Keeler, is a son of William Keeler and Lula Keeler; that he was born too late to be enrolled by the Dawes Commission; that his degree of Indian blood is 1/16. The affidavit bears a stamp which states, "This adjudication was prepared solely to distribute per capita funds. It is final and conclusive and cannot be amended, corrected nor additions made thereto. This is not a legal determination of heirs."

Attached to the affidavit is the certificate of Jack L. Taylor, Claims Examiner, which states that he certified "that the above list contains the names found to be the heirs of Lula Keeler and their proportionate share of Per Capita payment" and that he further certifies "that the above determination has been made in accordance with applicable laws relating to the distribution of personal property." The certificate was approved by the Area Director. We hold, however, that such ex parte affidavit cannot be regarded as a refutation of the allegations in the complaint that W. W. Keeler was not a citizen by blood of the Cherokee Tribe, even if we could take judicial notice of such affidavit. As stated above, we must determine the question of jurisdiction from the allega-

tions of the complaint that are not conclusionary in nature.

However, as stated above, we think it unnecessary to decide, and we do not decide whether the claim that W. W. Keeler was not a citizen by blood of the Cherokee Tribe presents a question of internal dispute and is not, therefore, within the jurisdiction of the federal district court.

Plaintiffs also urge that the due process clause of the Fifth Amendment and the equal protection and due process clauses of the Fourteenth Amendment and the provisions of the Fifteenth Amendment, by the passage of 25 U.S.C. § 1302(8) of the Indian Bill of Rights, have been made applicable to the Cherokee Tribe.

The provisions of the Constitution of the United States have no application to Indian nations or their governments, except as they are expressly made so by the Constitution (the Commerce Clause), or are made applicable by an Act of Congress.[9]

We think the legislative history of the so-called Indian Bill of Rights refutes the contentions of plaintiffs stated above.

The original bill to provide an Indian Bill of Rights, considered by the Senate Subcommittee, was brief and badly worded. It read as follows:

"* * * any Indian tribe, in exercising its powers of local self-government shall be subject to the same limitations and restraints as those which are imposed on the Government of the United States by the United States Constitution."

There were many objections to the broad language of the bill at the hearing, particularly as to the Fifteenth Amendment restraints embraced in the original bill.

The Department of the Interior submitted a substitute bill, which, with minor revisions, was introduced in the 90th Congress and eventually enacted into law as the present Indian Bill of Rights.

9. See case cited in note 4, supra.

In its endorsement of the substitute bill, the summary of the report of the Senate Subcommittee on the Judiciary stated:

"The Department of Interior's bill would, in effect, impose upon the Indian governments the same restrictions applicable presently to the Federal and State governments with several notable exceptions, viz., the 15th amendment, certain of the procedural requirements of the 5th, 6th, and 7th amendments, and, in some respects, the equal protection requirement of the 14th amendment."

The summary of the report of the Subcommittee was endorsed and adopted by the Senate Committee on the Judiciary. Such report makes it clear that Congress intended that the provisions of the Fifteenth Amendment, certain procedural provisions of the Fifth, Sixth, and Seventh Amendments, and in some respects the equal protection requirement of the Fourteenth Amendment should not be embraced in the Indian Bill of Rights.

It is also clear from such report that Congress was concerned primarily with tribal administration of justice and imposition of tribal penalties and forfeitures, and not with the specifics of tribal structure or officeholding. By its stated intentional exclusion from the Act of the provisions of the Fifteenth Amendment, any basis of federal court jurisdiction over tribal elections was definitely eliminated.

■ Nothing in the Act or its history discloses any implied requirement that a tribe select its leaders by elections at all, or that earlier Acts authorizing presidential appointments of tribal officials have been repealed. Even the Constitution of the United States does not require that the chief executive of a unit of government, such as a state, be elected by its citizenry instead of being appointed by someone else. Thus, the Supreme Court has held that it is permissible for a state governor to be selected by the legislature, rather than by a majority of its voters.[10]

■ Such Bill of Rights applies to the Indian nations and the acts of their executive and judicial officials and their legislatures. Its limitations apply only to them, and not to the power of Congress to enact legislation with respect to Indian nations and tribes, and does not have the effect of repealing legislation by Congress with respect to Indian tribes.

When consideration is given to the fact that the summary of the bill, referred to above, stated the equal protection clause in § 1302(8) of the Indian Bill of Rights was not as broad as the equal protection clause of the Fourteenth Amendment, we are of the opinion the allegations of the complaint do not state facts showing a violation of such clause in the Indian Bill of Rights. Indeed, we would reach that conclusion if the Fourteenth Amendment provision was applicable in the instant case, which it is not.

The Executive Committee created on July 30, 1948, has been succeeded by the Executive Committee created in September 1967.

The plaintiffs do not allege that they did not have notice of the 1967 election nor were in any way interfered with or prevented from voting at such election, nor that they were in anywise prejudiced by the fact that notice of the election was printed in English only, or that the election was held on two days, one week apart. They do not allege that they cannot read English.

■ The allegations simply show that a group of Cherokees out of power are dissatisfied with the officials of a group in power, and assert that such officials are not properly or wisely operating the government for the best interest of the members of the Cherokee Tribe and Nation. That is a common assertion by the leaders and some members of a party out of power. But it does not

10. Fortson v. Morris, 385 U.S. 231, 234, 87 S.Ct. 446, 17 L.Ed.2d 330.

amount, if true, to a denial of the equal protection of the laws.

The allegations of the complaint do not show a denial to the plaintiffs of the equal protection of any of the Cherokee laws.

■ 25 U.S.C.A. § 1301 did not give the federal district court jurisdiction of the instant case. The actions under that section are expressly limited to actions in the nature of mandamus and an action for a declaratory judgment is not in the nature of an action for mandamus.

■ 28 U.S.C.A. § 2201 (the Declaratory Judgment Statute) does not itself create jurisdiction. It merely adds an additional remedy when the court already has jurisdiction to entertain the suit.[11]

We hold that the complaint was properly dismissed for want of jurisdiction. We express no views as to whether there are other remedies open to the plaintiffs for redress of the claims they set out in the complaint. Such dismissal, of course, is without any prejudice to any other action the plaintiffs may elect to bring in a court having jurisdiction of such action.

Affirmed.

### APPENDIX I

"Jurisdiction of this action is conferred upon this Court by Title 28, Sections 1331 and 2201 and 1261, and Title 25, Sections 1301 and 1302 of the United States Code Annotated, and by the 5th and 15th Amendments, United States Constitution, and by the laws and treaties of the United States with or pertaining to the Cherokee Indians.

"I

"Plaintiffs are all Cherokees and reside in northeastern Oklahoma within the confines of what was the Cherokee Nation, and are descendants of enrolled citizens of the Cherokee Nation, and are members of the existing Cherokee people.

"Plaintiffs Charley S. Guess and Lucille Proctor are carried on the membership rolls of the defendant, United Keetoowah Band of Cherokee Indians in Oklahoma, as members.

"II

"The defendant, W. W. Keeler, holds and has held the Office of Principal Chief of the Cherokee Nation since December 1, 1949, being then appointed to that Office by the then President of the United States and subsequently re-appointed on July 21, 1954, by the then United States Secretary of Interior.

\*　\*　\*　\*　\*　\*

"The defendant, United Keetoowah Band of Cherokee Indians in Oklahoma (hereinafter called the Band), is an institution incorporated with powers of government under the laws of the United States and has a charter, constitution and by-laws approved by the United States Assistant Secretary of Interior on May 8, 1950.

"The defendants, Mrs. Wynona Day, Dr. Orange Starr, C. C. Victory, Tom R. Morton, Earl Crawford, John Masters, Richard Chuculade, N. B. Johnson, Jesse L. Ballard, and Washy Mayes, hold positions in an institution called the Cherokee Executive Committee, formed on July 30, 1948, at a meeting in Tahlequah, Oklahoma.

"III

"There exists an actual justiciable controversy between plaintiffs and the defendants, wherein plaintiffs allege that each of the defendants, W. W. Keeler, acting as Principal Chief of the Cherokee Nation, Band and its purported Officers, and Cherokee Executive Committee and its purported Members, are unlawfully constituted, and that each unlawfully recognizes and supports each other as duly constituted bodies of Cherokee government, and that each uses false and racist concepts to justify and

---

11. Wells v. United States, 9 Cir., 280 F.2d 275, 277.

continue this unlawful structure of power over the Cherokee people.

\*     \*     \*     \*     \*     \*

## "IV

"That the Act of Congress of April 26, 1906 (34 Stat. 137), insofar as it provides for the removal and appointment of the Principal Chief of the Cherokee Nation by the President of the United States, is in violation of the 5th and 15th Amendments to the United States Constitution.

## "V

"That the appointment to the Office of Principal Chief of W. W. Keeler is unlawful in that the Act of Congress of April 26, 1906, requires that the appointee be a citizen of the tribe. W. W. Keeler is not a citizen of the tribe.

## "VI

"That in permitting the defendant, W. W. Keeler, to serve as Principal Chief of the Cherokee Nation, the defendant Walter J. Hickel, Secretary of Interior, is not performing his duty as required by law, and that the defendant, Virgil Harrington, Area Director, in supporting W. W. Keeler as Principal Chief, is not performing his duty as required by law.

## "VII

"That the named defendants holding positions on the Cherokee Executive Committee arbitrarily and unlawfully support the holding of the defendant, W. W. Keeler, to the Office of Principal Chief of the Cherokee Nation, and have combined with and supported said defendant, W. W. Keeler, to suppress the efforts of Cherokees toward management of Cherokee affairs.

## "VIII

"That said defendant Band arbitrarily and unlawfully supports the holding of the defendant, W. W. Keeler, to the Office of Principal Chief of the Cherokee Nation, and has combined with and supported said defendant, W. W. Keeler, to suppress the efforts of Cherokees toward management of Cherokee affairs.

## "IX

"That the named defendants holding positions on the Cherokee Executive Committee hold said positions unlawfully and without the consent of the Cherokee people. That the Cherokee Executive Committee (hereinafter called the Committee) was appointed by the then Principal (appointed) Chief of the Cherokee Nation at a Convention in Tahlequah, Oklahoma, on July 30, 1948.

"That said Convention, according to published notices thereof, was for duly enrolled Cherokees, and yet this rule was disregarded during and before said Convention, and that said published notices were not in good faith and were in fact intended only to secure the passive presence of enough Cherokees to falsely indicate Cherokee approval of the Convention.

\*     \*     \*     \*     \*     \*

"That the Committee is, in fact, a rubber stamp for the policies of the defendant, W. W. Keeler, and the member defendants of said Committee have never come to terms with the assumption underlying his holding the Office of Principal Chief, and sincerely believe the 'Chief's' intelligence, perseverance and affluence serve uniquely and solely to benefit the Cherokee people.

"That the member defendants of said Committee are so blindly committed to this colonial assumption and to the greatness of W. W. Keeler that they belittle their own worth, and that, despite the adoption of a resolution in the Convention of July 30, 1948, requiring the adoption by the Committee of by-laws, these by-laws and rules have never been formulated and adopted, and the Committee allows itself to be guided and directed by W. W. Keeler.

## "X

"The defendant Band is not and has not been a Cherokee institution, and it and its purported Officers have been and are used, displayed and controlled by each of the other defendants and their predecessors toward the false indication that the Cherokee people are in-

volved in the management of Cherokee affairs.

"The formation and incorporation of the Band and its unincorporated predecessor was Cherokee in name only and was attended by misinformation and purposes unknown to and unavailable to the Cherokee people. The Band is not now and never has been regarded as Cherokee by Cherokees, with the dubious exception of the dozen or so misinformed or misled, by great promises or paltry jobs, persons who claim and have claimed Offices in said Band.

"There has never been a general meeting of the membership of the Band, and no proper and lawful election has ever been held for Offices of the Band. The election held in September of 1967 was an election in name only and was defective and unlawful in such basic requirements as notice, nomination procedure, secret balloting, designation as general or special, care of the ballot box, announcement of result, and limitations on election officials. Additionally, the ballots were only in the English language, and the election was held on two days, one week apart.

"This election was attended by the defendant, W. W. Keeler, and the defendant, Virgil Harrington, and by member defendants of the Committee, and these defendants know and are aware of the requirements for a valid, public election, and knew that said election was unlawful, and that the Band since its beginning had failed to hold required elections, and that such elections as had been held were defective in the same respects as the election in September of 1967.

\* \* \* \* \* \*

"XI

"That the defendant, W. W. Keeler, is not a Cherokee, and that many of the member defendants of the Committee are not Cherokees, but that all of these, and their agents and predecessors in Office, in pretending to be duly constituted authorities publicly and repeatedly use the false and racist concept of 'degree of blood', and in so doing have and are confusing and damaging the self identity of the Cherokee people and the development of Cherokees as leaders of the Cherokee people.

"XII

"Each of the above actions of the defendants cause and have caused plaintiffs and Cherokees generally great and irreparable harm and damage, and prevent Cherokees from developing Cherokee solutions to Cherokee problems, and the Cherokee people to remain leaderless and powerless and impoverished, and have denied plaintiffs and Cherokees generally the equal protection of the laws pertaining to the government of the Cherokee people and of the laws of the Band, and have deprived plaintiffs and Cherokees generally of liberty and property without due process of law in excess of a value of $10,000.00.

"\* \* \*."

APPENDIX II

Act of April 11, 1968, 82 Stat. 77, 25 U. S.C. §§ 1301, 1302.

"§ *1301. Definitions.*

"For purposes of this subchapter, the term—

"(1) 'Indian tribe' means any tribe, band, or other group of Indians subject to the jurisdiction of the United States and recognized as possessing powers of self-government;

"(2) 'powers of self-government' means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and

"(3) 'Indian court' means any Indian tribal court or court of Indian offense.

"§ *1302. Constitutional rights.*

"No Indian tribe in exercising powers of self-government shall—

"(1) make or enforce any law prohibiting the free exercise of religion,

or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

"(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;

"(3) subject any person for the same offense to be twice put in jeopardy;

"(4) compel any person in any criminal case to be a witness against himself;

"(5) take any private property for a public use without just compensation;

"(6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

"(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six months or a fine of $500, or both;

"(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;

"(9) pass any bill of attainder or ex post facto law; or

"(10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons."