GLICKSTEIN, Judge.
This is an appeal by the members of the Florida cabinet, who constituted the Department of Revenue in 1976, from a summary final judgment entered in 1984, upon motions therefor tendered in 1978, in a declaratory action filed two years earlier. We affirm that part of the trial court’s conclusions, made eight years after the Seminole Tribe had so urged the state court to conclude, that it did not have subject matter jurisdiction. We assume the untoward delay in so concluding was, in some part, occasioned by the trial court’s wish to go further, as it did, and come to grips with the merits of the controversy; namely, the right of the state to collect ■from the tribe the taxes described in paragraphs 13 and 14 of the complaint, which read:
13. The Department contends that the Defendant Corporation is responsible for the collection and remission of:
(1) the sales tax imposed on the retail sale and rental of tangible personal property to non-Indians by Section 212.05, Florida Statutes;
(2) the admissions tax imposed on the value received from the admission of non-Indians to the Indian reservation or any amusement facilities contained therein by Section 212.04, Florida Statutes;
(3) the transient rentals tax imposed upon the value received from renting, leasing or letting any living quarters, sleeping or housekeeping accommodations in, from, or a part of or in connection with any hotel, rooming house or tourist or trailer camp to non-Indians imposed by Section 212.03, Florida Statutes; and
(4) the lease or rental tax imposed on the value received for renting, leasing or letting any real property to non-Indians imposed by Section 212.031, Florida Statutes.
14. The Department further contends that:
a. (1) To the extent that retail sales and rentals of tangible personal property are made to non-Indians on the Indian *878 reservation upon whom the state has -validly imposed a sales tax with respect to the article sold or rented, the State may require the Defendant Corporation to add the tax to the sales or rental price as provided by Sections 212.05 and 212.07, Florida Statutes, and thereby aid the Department’s collection and enforcement of the tax.
(2) To the extent that there is a charge by the Defendant Corporation for the admission of a non-Indian to the Indian reservation or any amusement facilities contained therein upon whom the State has validly imposed an admission tax, the State may require the Defendant Corporation to add the tax to the admission price as provided by Section 212.04, Florida Statutes and thereby aid the Department’s collection and enforcement of the tax.
(3) To the extent that the Defendant Corporation rents, leases or lets any living quarters, sleeping or housekeeping accommodations in, from or a part of, or in connection with any hotel rooming house or tourist or trailer camp to non-Indians upon whom the State has validly imposed a transient rentals tax, the State may require the Defendant Corporation to add the tax to the rental price as provided by Section 212.03, Florida Statutes and thereby aid the Department’s collection and enforcement of the tax.
(4) To the extent that the Defendant-Corporation leases, rents or lets any real property to non-Indians upon whom the State has validly imposed a lease or rental tax, the State may require the Defendant Corporation to add the tax to the rental price as provided by Section 212.-031, Florida Statutes and thereby aid in the Department’s collection and enforcement of the tax.
b. Such a requirement is a minimal burden designed to avoid the likelihood that in its absence non-Indians will avoid payment of a lawful tax.
c. The imposition of the tax does not frustrate tribal government or run afoul of any federal statute dealing with reservation Indian affairs.
The law today is the same as it was when the tribe moved to dismiss the action in early 1977 because of a lack of subject matter jurisdiction. Chapter 15, U.S.C.A. is entitled, ‘Constitutional Rights of Indians.’ Sub-chapter III is entitled, ‘Jurisdiction over Criminal and Civil Actions.’ Section 1322 is entitled, ‘Assumption by State of civil jurisdiction’; and sub-section (a), entitled ‘Consent of the United States; force and effect of civil laws,’ reads:
The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.
(Emphasis added.) The tribe, in this case, did not consent to the state court’s assumption of jurisdiction to decide the questions involved. It moved to dismiss the complaint on the ground that the court lacked subject matter jurisdiction. The trial court neither granted nor denied the motion but deferred action thereon until its ultimate ruling in 1984 when it declared that it did not have subject matter jurisdiction. It also declared that if this court were to find that the trial court did have jurisdiction, the tribe was nevertheless entitled to summary final judgment.
The history of the Seminole Tribe is caught up in the language of Justice Black *879 in Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959):
Originally the Indian tribes were separate nations within what is now the United States. Through conquest and treaties they were induced to give up complete independence and the right to go to war in exchange for federal protection, aid, and grants of land. When the lands granted lay within States these governments sometimes sought to impose their laws and courts on the Indians. Around 1830 the Georgia Legislature extended its laws to the Cherokee Reservation despite federal treaties with the Indians which set aside this land for them. The Georgia statutes forbade the Cherokees from enacting laws or holding courts and prohibited outsiders from being on the Reservation except with permission of the State Governor. The constitutionality of these laws was tested in Worcester v. Georgia (US) 6 Pet 515, 8 L Ed 483, when the State sought to punish a white man, licensed by the Federal Government to practice as a missionary among the Cherokees, for his refusal to leave the Reservation. Rendering one of his most courageous and eloquent opinions, Chief Justice Marshall held that Georgia’s assertion of power was invalid.
Id. at 218-219, 79 S.Ct. at 269-270, 3 L.Ed.2d at 253 (footnotes omitted). Justice Black said further:
Congress has also acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation. To assure adequate government of the Indian tribes it enacted comprehensive statutes in 1834 regulating trade with Indians and organizing a Department of Indian Affairs. 4 Stat 729, 735. Not satisfied solely with centralized government of Indians, it encouraged tribal governments and courts to become stronger and more highly organized. See, e.g., the Wheeler-Howard Act, §§ 16, 17, 48 Stat 987, 988, 25 USC §§ 476, 477. Congress has followed a policy calculated eventually to make all Indians full-fledged participants in American society. This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the Indians permits the change without disadvantage to them. See HR Rep No. 848, 83d Cong, 1st Sess 3, 6, 7 (1953). Significantly, when Congress has wished the States to exercise this power it has expressly granted them the jurisdiction which Worcester v. Georgia had denied.[6]
Id. at 220-221, 79 S.Ct. at 271, 3 L.Ed.2d at 254.
See a discussion of the 1968 Legislation in Kennerly v. District Court of the Ninth Judicial District of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971).
In Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the court said:
Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. Turner v. United States, 248 U.S. 354, 358, 63 L.Ed. 291, 39 S.Ct. 109 [110] (1919); United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512-513, 84 L.Ed. 894, 60 S.Ct. 653 [656-657] (1940); Puyallup Tribe v. Washington Dept. of Game, 433 U.S. 165, 172-173, 53 L.Ed.2d 667, 97 S.Ct. 2616 [2621-2622] (1977). This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But “without congressional authorization,” the “Indian Nations are exempt from suit.” United States v. United States Fidelity & Guaranty Co., supra [309 U.S. 506], at 512, 84 L.Ed. 894, 60 S.Ct. 653 [at 656],
It is settled that a waiver of sovereign immunity “ ‘cannot be implied but must *880 be unequivocally expressed.’ ” United States v. Testan, 424 U.S. 392, 399, 47 L.Ed.2d 114, 96 S.Ct. 948 [953-954] (1976), quoting, United States v. King, 395 U.S. 1, 4, 23 L.Ed.2d 52, 89 S.Ct. 1501 [1503] (1969).
Id. at 58-59, 98 S.Ct. at 1677, 56 L.Ed.2d at 115.
We wish to mention one other decision of the Supreme Court, Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), in which the court said:
Finally, in construing this “admittedly ambiguous” statute, Board of Comm’rs v. Seber, 318 U.S. [705] at 713, 87 L.Ed. 1094, 63 S.Ct. 920 [at 925], we must be guided by that “eminently sound and vital canon,” Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 655 n. 7, 48 L.Ed.2d 274, 96 S.Ct. 1793 [1797 n. 7] (1976), that “statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.” Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 63 L.Ed. 138, 39 S.Ct. 40 [42] (1918). See Choate v. Trapp, 224 U.S. 665, 675, 56 L.Ed. 941, 32 S.Ct. 565 [569] (1912); Antoine v. Washington, 420 U.S. 194, 199-200, 43 L.Ed.2d 129, 95 S.Ct. 944 [948-949] (1975). This principle of statutory construction has particular force in the face of claims that ambiguous statutes abolish by implication Indian tax immunities. McClanahan v. Arizona State Tag; Comm’n, 411 U.S. [164] at 174, 36 L.Ed.2d 129, 93 S.Ct. 1257 [at 1263]; Squire v. Capoeman, 351 U.S. 1, 6-7, 100 L.Ed. 883, 76 S.Ct. 611 [614-615] (1956); Carpenter v. Shaw, 280 U.S. 363, 366-367, 74 L.Ed. 478, 50 S.Ct. 121 [122-123] (1930). “This is so because ... Indians stand in a special relation to the federal government from which the states are excluded unless the Congress has manifested a clear purpose to terminate [a tax] immunity and allow states to .treat Indians as part of the general community.” Oklahoma Tax Comm’n v. United States, 319 U.S. 598, 613-614, 87 L.Ed. 1612, 63 S.Ct. 1284 [1291-1292] (1943) (Murphy, J., dissenting).
Id. at 392, 96 S.Ct. at 2112-13, and 48 L.Ed.2d at 723. It follows from all of the above that caution should not only be applied to answering for what can tribes be sued but also to where they can be sued.
These high court decisions are supported by those of various circuit courts of appeal.
In Maryland Casualty Company v. Citizens National Bank of West Hollywood, 361 F.2d 517 (5th Cir.1966), the court said:
The paramount authority of the federal government over Indian tribes and Indians is derived from the Constitution, and Congress has the power and the duty to enact legislation for their protection as wards of the United States.
From the beginning of our government, Indian nations or tribes have been regarded as dependent political communities or nations; and as possessing the attributes of sovereignty, except where they have been taken away by Congressional action. They are quasi-sovereign nations.
Indian nations, as an attribute of their quasi-sovereignty, are immune from suit, either in the federal or state courts, without Congressional authorization.

The fact that the Seminole Tribe was engaged in an enterprise private or commercial in character, rather than governmental, is not material. It is in such enterprises and transactions that the Indian tribes and the Indians need protection. The history of intercourse between the Indian tribes and Indians with whites demonstrates such need.
Id. at 520-521 (footnotes omitted).
Finally in Groundhog v. Keeler, 442 F.2d 674 (10th Cir.1971), the court said:
The Indian nations or tribes are dependent political nations and wards of the United States. They possess the attributes of sovereignty, insofar as they have not been taken away by Congress. They are quasi-sovereign nations. The Constitution applies to Indian nations only to the extent it expressly binds them *881 or is made binding on them by treaty or Act of Congress.
An Indian tribe or nation is not a federal instrumentality and is not within the reach of the Fifth Amendment, and due process restraint places restrictions on the Indian tribes only when it is so provided by Congressional enactment.
However, it is well settled that Congress has exclusive and plenary power to enact legislation with respect to the Indian tribes.
Id. at 678 (footnotes omitted).
We decline to comment upon the taxation issues raised by the Department in light of our affirmance of the trial court’s decision upon the initial issue of subject matter jurisdiction.
LETTS and DELL, JJ., concur.

 See, e.g., 62 Stat 1224, 64 Stat 845, 25 USC §§ 232, 233 (1952) (granting broad civil and criminal jurisdiction to New York); 18 USC § 1162, 28 USC § 1360 (granting broad civil and criminal jurisdiction to California, Minnesota, Nebraska, Oregon, and Wisconsin). The series of statutes granting extensive jurisdiction over Oklahoma Indians to state courts are discussed in Cohen, op cit supra, note 4, at 985-1051.