611 So.2d 1235 (1993)
Carole Francis HOUGHTALING, Petitioner,
v.
SEMINOLE TRIBE OF FLORIDA, Respondent.
No. 79177.
Supreme Court of Florida.
January 7, 1993.
H. Irene Higginbotham and Mary E. Mann of Acosta & Mann, St. Petersburg, for petitioner.
W. Douglas Berry and Melinda J. Brazel of Butler, Burnett & Pappas, Tampa, and Donald A. Orlovsky of Kamen & Orlovsky, P.A., West Palm Beach, for respondent.
Kimberly Sands, Academy of Florida Trial Lawyers, Daytona Beach, amicus curiae for Academy of Florida Trial Lawyers.
OVERTON, Justice.
We have for review Seminole Tribe v. Houghtaling, 589 So.2d 1030 (Fla. 2d DCA 1991), in which the district court determined that Florida courts are without jurisdiction to resolve civil suits brought against the Seminole Tribe of Florida (Tribe) for an accident occurring on tribal property in Hillsborough County. The district court certified the following question as being of great public importance:
DOES SECTION 285.16, FLORIDA STATUTES (1989), PROVIDE FLORIDA COURTS WITH JURISDICTION TO RESOLVE CIVIL SUITS BROUGHT AGAINST THE SEMINOLE TRIBE?
Id. at 1033. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the question in the negative and approve the decision of the district court, holding that, under these circumstances, the Tribe is immune from suit.
The relevant facts reflect that Carole Francis Houghtaling allegedly sustained an injury at the Tribe's bingo hall in Tampa. It is uncontroverted that the property on which she was injured is owned by the Tribe. In her complaint for personal injury, Houghtaling claimed that she was injured when she fell on the property. *1236 Houghtaling alleged that the Tribe had been negligent in maintaining the property and that such negligence was the proximate cause of her injuries. The Tribe filed a motion to dismiss on the ground that Florida courts lack subject matter jurisdiction. The circuit court denied the motion and the Tribe then filed a Petition for a Writ of Common Law Certiorari in the Second District Court of Appeal. The district court granted the writ and quashed the circuit court's order denying the Tribe's motion to dismiss. In its decision, the district court explained that Indian tribes historically have been viewed as possessing the same type of common law immunity from suit as that enjoyed by sovereign governmental entities. It determined that, while the grant of immunity has been the subject of criticism, particularly when an Indian tribe invokes its immunity after engaging in a commercial activity with non-Indians, the tribe is immune from suit under these circumstances because the record does not establish an explicit and unequivocal waiver of immunity under existing federal law and statutes. The district court relied, in part, on the decision of the Supreme Court of Alaska in Atkinson v. Haldane, 569 P.2d 151, 152 (Alaska 1977), in which that court extensively examined and reviewed the sovereign immunity of Indian tribes.
In order to understand the issue in this case, it is necessary to review the case law and legislative history of the sovereign immunity of Indian tribes. The sovereign immunity of Indian tribes was first acknowledged by the United States Supreme Court in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832), in which Chief Justice Marshall stated that the Indian tribes were "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all lands within those boundaries, which is not only acknowledged, but guaranteed by the United States." The case of Thebo v. Choctaw Tribe of Indians, 66 F. 372 (8th Cir.1895), involved a suit for attorney's fees by a former tribal attorney. The Eighth Circuit, in rejecting the claim, stated:
Being a domestic and dependent state, the United States may authorize suit to be brought against [the Choctaw Nation]. But, for obvious reasons, this power has been sparingly exercised. It has been the settled policy of the United States not to authorize such suits except in a few cases, where the subject-matter of the controversy was particularly specified, and was of such a nature that the public interests, as well as the interests of the Nation, seemed to require the exercise of the jurisdiction. It has been the policy of the United States to place and maintain the Choctaw Nation and the other civilized Indian Nations in the Indian Territory, so far as relates to suits against them, on the plane of independent states.

Id. at 375 (emphasis added). In United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940), a judgment on a crossclaim had been entered against the Choctaw and Chickasaw Nations. The crossclaim was not appealed. The United States Supreme Court stated:
We are of the view, however, that the ... judgment is void in so far as it undertakes to fix a credit against the Indian Nations... . The public policy which exempted the dependent as well as the dominant sovereignties from suit without consent continues this immunity even after dissolution of the tribal government. These Indian Nations are exempt from suit without Congressional authorization.
Id. at 512, 60 S.Ct. at 656 (footnotes omitted).
In the Indian Reorganization Act of 1934, the United States Congress enacted legislation that provided two distinctive means for Indian tribes to organize and operate. 48 Stat. 987 (1934) (current version at 25 U.S.C. § 476-77 (1988)). Section 16 of the Act provides for a tribe's governmental operation. Id. That section provides:
Any Indian tribe, or tribes, residing on the same reservation, shall have the *1237 right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws, when ratified as aforesaid and approved by the Secretary of the Interior, shall be revocable by an election open to the same voters and conducted in the same manner as the original constitution and bylaws.
In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments. The Secretary of the Interior shall advise such tribe or its tribal council of all appropriation estimates or Federal projects for the benefit of the tribe prior to the submission of such estimates to the Bureau of the Budget and the Congress.
25 U.S.C.A. § 476 (1983).
In section 17, the Act provides for a tribe to operate as a corporation and reads as follows:
The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: provided, That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.
48 Stat. 988 (1953) (current version at 25 U.S.C. § 477 (1988)).
It is clear that section 16 prescribes how tribes are to operate as a government and that section 17 prescribes their authority to operate as a business entity. This distinction is important in the instant case since Houghtaling does not assert that the Seminole Tribe is a section 17 corporation. We note that, in opinion M-36515, the Solicitor of the Department of the Interior explained the distinct purpose of each of these sections. The Solicitor stated:
The purpose of Congress in enacting section 16 of the Indian Reorganization Act was to facilitate and to stabilize the tribal organization of Indians residing on the same reservation, for their common welfare. It provided their political organization. The purpose of Congress in enacting section 17 of the Indian Reorganization Act was to empower the Secretary to issue a charter of business incorporation to such tribes to enable them to conduct business through this modern device, which charter cannot be revoked or surrendered except by act of Congress. This corporation, although composed of the same members as the political body, is to be a separate entity, and thus more capable of obtaining credit and otherwise expediting the business of the tribe, while removing the possibility of federal liability for activities of that nature. As a result, the powers, privileges *1238 and responsibilities of these tribal organizations materially differ.
65 I.D. 483, 484 (1958).
In 1953, Congress enacted Public Law 83-280, granting criminal and limited civil jurisdiction over Indians in California, Minnesota, Nebraska, Oregon, and Wisconsin. Ch. 505, § 4, 67 Stat. 589 (1953) (codified as amended at 28 U.S.C. § 1360 (1988)). Congress granted the remaining states the option of assuming this jurisdiction by legislative action. The pertinent portion of section 6 of Public Law 83-280 reads as follows:
Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory... .
28 U.S.C.A. § 1360(a) (1976). Section 7 of Public Law 280 provides:
[T]he consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of actions, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.
Pub.L. 83-280, ch. 505, § 7, 67 Stat. 590 (1953) (repealed 1968).[1]
In accordance with this authority, the Florida Legislature enacted section 285.16, Florida Statutes (1961), which reads, in pertinent part, as follows:
(1) The State of Florida hereby assumes jurisdiction over criminal offenses committed by or against Indians or other persons within Indian reservations and over civil causes of action between Indians or other persons or to which Indians or other persons are parties rising within Indian reservations.
§ 285.16(1), Fla. Stat. (1961).
Houghtaling contends that Florida courts have subject matter jurisdiction under section 285.16, Florida Statutes (1989), to hear civil disputes arising on Seminole tribal lands, including cases brought against the Tribe itself. Houghtaling argues that section 285.16 was enacted pursuant to Congress's express waiver of sovereign immunity for Indian tribes in Public Law 83-280 and that, consequently, Florida courts have jurisdiction over civil actions against the Tribe itself. We disagree and find that, although Florida does have jurisdiction over suits between Indians and other persons, it does not have jurisdiction in a suit by other persons against the Tribe.
In Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the United States Supreme Court rejected a similar argument. In Bryan, the Supreme Court stated that "[t]he primary concern of Congress in enacting Pub.L. [83-]280 that emerges from its sparse legislative history was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." Id. at 379, 96 S.Ct. at 2106. Bryan dealt with the issue of whether Public Law 83-280 was "a Congressional grant of power to the States to tax reservation Indians." Id. at 375, 96 S.Ct. at 2104. In rejecting this theory, the United States Supreme Court stated:
Pub.L. [83-]280 was only one of many types of assimilationist legislation under active consideration in 1953. And nothing in its legislative history remotely suggests that Congress meant the Act's *1239 extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than "`private, voluntary organizations,'"  a possible result if tribal governments and reservation Indians were subordinated to the full panoply of civil regulatory powers, including taxation, of state and local governments. The Act itself refutes such an inference: there is notably absent any conferral of state jurisdiction over the tribes themselves, and § 4(c), 28 U.S.C. § 1360(c), providing for the "full force and effect" of any tribal ordinances or customs "heretofore or hereafter adopted by an Indian tribe .. . if not inconsistent with any applicable civil law of the State," contemplates the continuing vitality of tribal government.
Id. at 387-88, 96 S.Ct. at 2110 (citations omitted; footnotes omitted; emphasis added).
The Alaska Supreme Court came to a similar conclusion in Atkinson v. Haldane, 569 P.2d 151 (Alaska 1977), a case involving the wrongful death of two Indians allegedly caused by the negligence of four police officers employed by the Metlakatla Indian Community. In Haldane, the Alaska Supreme Court applied the Bryan analysis and concluded that, because Public Law 83-280 did not clearly and expressly waive the sovereign immunity of the Indian tribes, the Metlakatla Indian Community possessed sovereign immunity with respect to wrongful death actions.
In this jurisdiction, the Fourth District Court of Appeal has reached the same conclusion. In Askew v. Seminole Tribe, 474 So.2d 877 (Fla. 4th DCA 1985), the Fourth District Court of Appeal held that circuit courts lacked subject matter jurisdiction in cases involving the taxation of Indian ventures on Indian land. Similarly, in Seminole Police Department v. Casadella, 478 So.2d 470 (Fla. 4th DCA 1985), the Fourth District held that, absent the Tribe's consent, Florida courts lacked subject matter jurisdiction in a case involving a wrongful arrest by tribal police. In both cases, the court held that Public Law 83-280 and section 285.16 did not waive the Tribe's sovereign immunity.
Indian tribes "have been regarded as dependent political communities or nations; and as possessing the attributes of sovereignty, except where they have been taken away by Congressional action." Maryland Casualty Co. v. Citizens National Bank, 361 F.2d 517, 520 (5th Cir.1966) (footnotes omitted). The United States Supreme Court has consistently stated that "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); see also Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); Williams v. Pyramid Lake Paiute Tribe, 625 F. Supp. 1457 (D.Nev. 1986); Atkinson v. Haldane, 569 P.2d 151 (Alaska 1977); Askew v. Seminole Tribe, Inc., 474 So.2d 877 (Fla. 4th DCA 1985). Clearly, the sovereign immunity of Indian tribes is "subject to the superior and plenary control of Congress" and cannot be waived absent the express consent of Congress. Santa Clara Pueblo, 436 U.S. at 58-59, 98 S.Ct. at 1677. We find no express waiver of tribal sovereign immunity in Public Law 83-280.
Accordingly, we hold that the Seminole Tribe is immune from suit and that Florida courts lack subject matter jurisdiction unless: (1) the Seminole Tribe has consented to suit in its section 16 charter, or (2) the organization owning the Bingo Hall is a section 17 corporate entity whose corporate charter allows it to be sued.[2] Furthermore, we find that Public Law 83-280 did not waive the Seminole Tribe's sovereign immunity and that, absent such an expressed waiver, section 285.16 cannot provide jurisdiction in suits against the Tribe.
*1240 In summary, we answer the question in the negative and approve the decision of the district court. In accordance with the district court's decision, we remand without prejudice to Houghtaling to establish whether the Seminole Tribe has expressly consented to suit in its section 16 organizational charter or may be sued under its section 17 corporate charter.
It is so ordered.
BARKETT, C.J., and McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] The repeal of this section did "not affect any cession of jurisdiction made pursuant to such section prior to its repeal." Pub.L. 90-284, Tit. IV, § 403(b), 82 Stat. 79 (1968).
[2] See Maryland Casualty Co. v. Citizens Nat'l Bank, 361 F.2d 517 (5th Cir.1966).