## ALASKA PACIFIC FISHERIES v. UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 212. Argued November 4, 1918.—Decided December 9, 1918.

For safeguarding and advancing a dependent Indian people, resident on islands belonging to the United States in the Territory of Alaska, Congress has power to reserve for their use, until otherwise provided by law, not only the upland of the islands but also the ad-

jacent submerged land and deep waters supplying fisheries essential
to the Indians' welfare.  P. 87.

An act of Congress set aside, "until otherwise provided by law the
body of lands known as Annette Islands," in Alaska, for the use of
the Metlakahtla Indians (recently emigrated from British Columbia
and settled on the islands with the encouragement of executive
and administrative officers,) and such other Alaskan natives as
might join them, to be held and used by them in common, under
regulations of the Secretary of the Interior.  The islands were a
well-defined group, uninhabited before the coming of the Indians,
who were peculiarly dependent on the adjacent fisheries.  *Held*,
in view of the circumstances at time of the enactment and its sub-
sequent construction, that the reservation included adjacent deep
waters; and that a fish net constructed therein by defendant 600
feet beyond high tide line, and whose operation might materially
reduce the supply of fish accessible to the Indians, was subject to
abatement at the suit of the United States.  P. 89.

240 Fed. Rep. 274, affirmed.

THE case is stated in the opinion.

*Mr. John A. Hellenthal* in a brief for appellant:

The act is explicit, reserving only the "body of lands
known as Annette Islands."  The water surrounding an
island forms no part of it.  Grants of land on navigable
water go only to ordinary high tide.

Public navigable waters are not part of the public
domain.  In a Territory, the United States holds them, not
as land-owner, but as sovereign, in trust for all the people,
who have common rights therein of fishery and naviga-
tion.  And this right of fishery is a property right.  *Mc-
Cready v. Virginia*, 94 U. S. 391; *Rossmiller v. State*, 114
Wisconsin, 169.  The Government as in the case of a State
may regulate the use for the benefit of all, but neither can
create a private fishing reserve for the benefit of a few to
the exclusion of all others.  *Illinois Central R. R. Co. v.
Illinois*, 146 U. S. 387; *Arnold v. Mundy*, 6 N. J. L. 1;
*Illinois Central R. R. Co. v. Chicago*, 176 U. S. 646; *Martin
v. Waddell*, 16 Pet. 345; *Pewaukee v. Savoy*, 103 Wis-

consin, 271; *Rossmiller* v. *State, supra.* These authorities show that a State cannot substantially impair the public rights of fishery and navigation, but is bound to preserve the public waters so that the people may be able to exercise these rights forever. These rights are no different and are no less binding on the Government when, the waters being in a Territory, title is held in trust for a future State. *Shively* v. *Bowlby,* 152 U. S. 1. The authority of the sovereign to make grants below high-water mark depends in each case upon whether the value of the public right will be enhanced or destroyed. *Manchester* v. *Massachusetts,* 139 U. S. 240. This is recognized in *Illinois Central R. R. Co.* v. *Illinois, supra,* as applied to a State. It applies also to the United States, in Alaska, where the Constitution is in full force. *Rasmussen* v. *United States,* 197 U. S. 516. See *United States* v. *Mackey,* 214 Fed. Rep. 146; *Shively* v. *Bowlby, supra; Illinois Steel Co.* v. *Bilot,* 109 Wisconsin, 418.

Grants of limited exclusive privileges, as for those who produce new supplies of fish or oysters, are upheld as benefiting the public right. *Commonwealth* v. *Weatherhead,* 110 Massachusetts, 175; *Rowe* v. *Smith,* 48 Connecticut, 444; *Commonwealth* v. *Vincent,* 108 Massachusetts, 441.

The effect of the proclamation is to create an exclusive fishery for the benefit of the Metlakahtlans. This is quite different from a withdrawal from entry of public land. *United States* v. *Midwest Oil Co.,* 236 U. S. 459. The Constitution nowhere confers upon the President any special power respecting navigable waters or fisheries; and the common law, in the light of which the Constitution must be considered, recognized no such right in the King. The fisheries in the navigable waters belong to the people at large. The Government has no interest therein which it can reserve for the use of any individual or class. The President cannot include such waters in an Indian reservation. *United States* v. *Ashton,* 170 Fed. Rep. 509.

The proclamation is contrary to § 254, Alaska Compiled Laws, prohibiting aliens from fishing in Alaskan waters. The Metlakahtlans are not natives of Alaska.

The fish-trap was not a purpresture. It was sanctioned by §§ 261, 262, c. 3, Alaska Compiled Laws, and in the exercise of appellant's right of fishing. *Lincoln* v. *Davis,* 53 Michigan, 375. It was vested property. *McCready* v. *Virginia, supra;* Farnham on Waters, § 394; *Lewis* v. *Portland,* 25 Oregon, 133; *Pitkin* v. *Olmstead,* 1 Root (Conn.), 217; *Lay* v. *King,* 5 Day (Conn.), 72; *Gallup* v. *Tracy,* 25 Connecticut, 10; *Post* v. *Kreischer,* 32 Hun (N. Y.), 49; *Glover* v. *Powell,* 10 N. J. Eq. 211.

The trap did not obstruct navigation, and authority under the Rivers and Harbors Act was not required.

*Mr. C. H. Hanford* argued the case for appellant:

The injunction strikes a legitimate business. The proclamation creates a private monopoly out of what by right is common to all. It is contrary to public policy. The act is not ambiguous and to strain its construction would not be permissible in the interest of the Indians who are neither wards of the Nation nor in need of charity. Government surveys of land stop at the water's edge. *Barney* v. *Keokuk,* 94 U. S. 324–328; *Mann* v. *Tacoma Land Co.,* 153 U. S. 273–286. Hence, a grant or reservation of a body of land described as an island is a tract having a water boundary; all within the line of separation between the solid and liquid elements constitutes the granted or reserved tract. *Shively* v. *Bowlby,* 152 U. S. 1. The only absolute right appurtenant to land bounded by navigable water is the right of access. An exclusive right was not necessary, in the case of these Indians, to the beneficial pursuit of their calling as fishermen. An exclusive right of fishery offshore is different from a right appertaining to land, so different in essence, so extraordinary, and so unnecessary to the beneficial use

of land, that it does not come within the category of rights appurtenant to the title to real estate. *Baron v. Alexander*, 206 Fed. Rep. 272; *Parker v. People*, 111 Illinois, 588. *Cf. Kennedy v. Becker*, 241 U. S. 556. *Russian-American Co. v. United States*, 199 U. S. 579, distinguished.

The act is special, to be strictly construed. *Expressum facit cessare tacitum.*

The President is unauthorized to appropriate any part of the public domain for alien Indians. 18 Opin. Atty. Gen. 557.

Congress alone has power to make rules and regulations respecting Alaska, and its governmental power is to be exercised with a view to the erection of new States to enter the Union on an equal footing with the original States. Congress has declared the status of Alaska to be territory eligible to become one or more States of the Union which will have governmental and proprietary rights with respect to its waters. Act of May 14, 1898, 30 Stat. 409; Alaska Compiled Laws, 1913, § 92.

The proclamation is the first and only public assertion of exclusive rights of fishery in the public waters of Alaska. It was not issued until after the appellant located and constructed its fish-trap, involving a large investment, with due observance of the fishing laws. Since Magna Charta control and regulation of fishing rights has been by the common law of England a legislative function, Crown grants of exclusive rights being expressly forbidden; and in the jurisprudence of this country based upon the common law, the right of fishery in public waters belongs to all the people, controlled and regulated within the States by statutes enacted by their respective legislatures. Gould on Waters, 3d ed., §§ 1, 2, 30, 32, 34, 36, 39, 189; *McCready v. Virginia*, 94 U. S. 391; *Manchester v. Massachusetts*, 139 U. S. 259, 260; *United States v. Shauver*, 214 Fed. Rep. 157; *United States v. McCullagh*, 221 Fed.

Rep. 292. This means that in a Territory the subject can only be regulated by acts of Congress.

The Government is not the real party in interest, but appears as a volunteer for the benefit of others to whom it is not legally or morally obligated. *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273, 286.

The fish-trap is a lawful structure on a lawful site.

The Rivers and Harbors Act affords no justification for an injunction in this case.

*Mr. Assistant Attorney General Brown* for the United States:

The power of the Government to reserve parts of the public domain for the exclusive use of Indian tribes is undoubted. This reservation was not for the Metlakahtlans alone, and they, besides, had acquired the same status as other Indian peoples longer resident within the bounds of our country.

The locus in question is part of the public domain within this rule. The United States has a title in these waters which it could even grant outright to individuals. *Shively* v. *Bowlby*, 152 U. S. 1. Undoubtedly, the United States has exercised sparingly its power to make such grants—they are not made under general laws—and has recognized that such lands, chiefly valuable for the public purposes of commerce, navigation and fishery, should be held as a whole, to be ultimately dealt with by the future State. See *Mann* v. *Tacoma Land Co.*, 153 U. S. 273. If, however, it be said that this is a holding in trust, it is a trust like that under which all the public lands of the Nation are held for the people of the whole country. *United States* v. *Trinidad Coal Co.*, 137 U. S. 160. "It is not for the courts to say how that trust shall be administered." *Light* v. *United States*, 220 U. S. 523, 537. So far as the policy interposes any check upon the free dis-

position of these tide lands it is a check upon the conscience and guide to the intelligence of Congress and is not a limitation upon its power. Where the grant is reasonably in aid of a public purpose, the power of the United States to make the grant is absolute.

The power to make the reservation is superior to any right of fishery the appellant may claim, and most especially the right to maintain a permanent fish-trap, affixed to the soil and necessarily excluding all others.

A general right of fishery at common law, if existing, is inapplicable to these waters, which were derived by the United States from the Emperor of all the Russias, with all the rights, franchises and privileges belonging to Russia when the cession was made. Treaty of 1867, 15 Stat. 539. Under the law of Russia, such property was at the sovereign's disposal. Russian Civil Code, bk. II, tit. I, c. II, arts. 248, 251; *ib.* tit. II, c. I, arts. 263, 264; Code Civil de l'Empire de Russie. Traduit sur les editions officielles par un Jurisconsulte Russe (with a prefatory essay by Victor Foucher, Advocat-General du Roi), Paris, 1841. The United States succeeded to the rights of the Czar. *Strother* v. *Lucas*, 12 Pet. 410.

There is, however, no such general right of fishery as the appellant asserts, effective against a reservation of the waters, for a public purpose, by the United States. The rights of a State in tide-lands depend in each case on the local law. *Packer* v. *Bird*, 137 U. S. 661; *Hardin* v. *Jordan*, 140 U. S. 371; *Illinois Central R. R. Co.* v. *Chicago*, 176 U. S. 646, 659. The state laws differ widely, and state decisions must therefore be applied with caution. *Shively* v. *Bowlby*, *supra*, p. 26. But it is established law in substantially every State of the Atlantic and Gulf seaboard that the sovereign may grant rights of fishery despite the alleged general right of the public [citing numerous state grants]. It is true these legislative grants are in general designed to encourage development of the fishing, espe-

cially the shell-fish, industry thus benefiting the public; but they are exclusive, and they do not, as appellant contends, add value to the public right of fishing. Such grants can serve no higher public purpose than does this Indian reservation.

*Arnold v. Mundy,* 6 N. J. L. 1, seems to have been overruled, *Shively v. Bowlby, supra; Stevens v. Patterson &c. R. R. Co.,* 5 Vroom, 532; *Pennsylvania R. R. Co. v. New York &c. R. R. Co.,* 23 N. J. Eq. 157; *Hoboken v. Pennsylvania R. R. Co.,* 124 U. S. 656, 688, 690, 691; and if accepted as law is fatal to appellant's claim of a vested right in an exclusive location. *McCready v. Virginia,* 94 U. S. 391, upholds the state power, as does also *Lincoln v. Davis,* 53 Michigan, 375. See *Donnelly v. United States,* 228 U. S. 243; *s. c.* 228 U. S. 708, 711. *Illinois Central R. R. Co. v. Illinois,* 146 U. S. 387, decided a question of Illinois law on peculiar facts, and did not involve rights of the United States. A grant to a railroad for its own profit generally of the control of practically the entire harbor of Chicago was held revocable. Here there is but a reservation, expressly revocable, for a public purpose. The *Illinois Case* contains dicta, doubtless among those referred to disapprovingly in *Shively v. Bowlby,*

The act of Congress contemplated not only the reservation of the uplands of "that body of lands known as Annette Islands," but also of the adjacent waters and, fairly construed, was such a reservation.

In any event the President's proclamation of April 28, 1916, was an effective exercise of the power of the United States to reserve such adjacent waters.

The proclamation was within the authorization of § 465, Rev. Stats.

The fish-trap, erected without license, was a purpresture and the appellant a mere trespasser. *Webber v. Harbor Commissioners,* 18 Wall. 57; *Russian-American Co. v. United States,* 199 U. S. 570.

The trap was erected in violation of the Rivers and
Harbors Act of 1899.

MR. JUSTICE VAN DEVANTER delivered the opinion of
the court.

This is a suit by the United States to enjoin the Alaska
Pacific Fisheries, a California corporation, from main-
taining, and to compel it to remove, an extensive fish-trap
erected by it in navigable waters at the Annette Islands in
Alaska. The objections urged against the trap are, first,
that it is within a reservation lawfully established for the
use of the Metlakahtla and other Indians, and, second,
that it is an unauthorized obstruction to the navigable
capacity of waters of the United States. A decree was
entered granting the relief sought, and this was affirmed
by the Circuit Court of Appeals. 240 Fed. Rep. 274.

The Annette Islands are a group of small islands in
southeastern Alaska. During the summer of 1887 some
800 Metlakahtla Indians emigrated from British Columbia
and settled on one of these islands. The emigration and
settlement were not only acquiesced in but encouraged by
executive and administrative officers of the United
States,[1] and subsequently were sanctioned by Congress
through the enactment of § 15 of the Act of March 3,
1891, c. 561, 26 Stat. 1101. That section reads as follows:

"That until otherwise provided by law the body of
lands known as Annette Islands, situated in Alexander
Archipelago in Southeastern Alaska, on the north side of
Dixon's entrance, be, and the same is hereby, set apart as a
reservation for the use of the Metlakahtla Indians, and
those people known as Metlakahtlans who have recently
emigrated from British Columbia to Alaska, and such

---

[1] House Ex. Docs., 50th Cong., 1st sess., vol. 10, p. 64, vol. 13, p. 34;
Sen. Mis. Doc., No. 144, 53d Cong., 2d sess.; Sen. Doc., No. 275, 55th
Cong., 2d sess.

other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior."

The fish-trap was erected in 1916 without the consent of the Indians or the Secretary of the Interior. It is a formidable structure consisting of heavy piling and wire webbing, is located in water of considerable depth, approximately 600 feet from the high tide line of the island on which the Indians settled, is intended to catch about 600,000 salmon in a single season, and its operation will tend materially to reduce the natural supply of fish accessible to the Indians.

The principal question for decision is whether the reservation created by the Act of 1891 embraces only the upland of the islands or includes as well the adjacent waters and submerged land. The question is one of construction—of determining what Congress intended by the words "the body of lands known as Annette Islands."

As an appreciation of the circumstances in which words are used usually is conducive and at times is essential to a right understanding of them, it is important, in approaching a solution of the question stated, to have in mind the circumstances in which the reservation was created—the power of Congress in the premises, the location and character of the islands, the situation and needs of the Indians and the object to be attained.

That Congress had power to make the reservation inclusive of the adjacent waters and submerged land as well as the upland needs little more than statement. All were the property of the United States and within a district where the entire dominion and sovereignty rested in the United States and over which Congress had complete legislative authority. *National Bank* v. *County of Yankton*, 101 U. S. 129, 133; *Shively* v. *Bowlby*, 152

U. S. 1, 47–48, 58; *United States* v. *Winans*, 198 U. S. 371, 383. The reservation was not in the nature of a private grant, but simply a setting apart, "until otherwise provided by law," of designated public property for a recognized public purpose—that of safe-guarding and advancing a dependent Indian people dwelling within the United States. See *United States* v. *Kagama*, 118 U. S. 375, 379, *et seq.; United States* v. *Rickert*, 188 U. S. 432, 437.

The islands are in the interior of the Alexander Archipelago and separated from other islands by well known bodies of water. Before the Metlakahtla settlement they were wild and uninhabited. While bearing a fair supply of timber, only a small portion of the upland is arable, more than three-fourths consisting of mountains and rocks. Salmon and other fish in large numbers frequent and pass through the waters adjacent to the shore and the opportunity thus afforded for securing fish for local consumption and for salting, curing, canning and sale gives to the islands a value for settlement and inhabitance which otherwise they would not have.

The purpose of the Metlakahtlans, in going to the islands, was to establish an Indian colony which would be self-sustaining and reasonably free from the obstacles which attend the advancement of a primitive people. They were largely fishermen and hunters, accustomed to live from the returns of those vocations, and looked upon the islands as a suitable location for their colony, because the fishery adjacent to the shore would afford a primary means of subsistence and a promising opportunity for industrial and commercial development.

After their settlement and before the reservation was created, the Indians, under the guidance of a noted missionary, adopted a form of self-government suited to their needs; established for themselves a village with substantial dwellings, schoolhouses and the like, and

constructed and installed an extensive establishment where they canned salmon for the market.[1]

The purpose of creating the reservation was to encourage, assist and protect the Indians in their effort to train themselves to habits of industry, become self-sustaining and advance to the ways of civilized life. True, the Metlakahtlans were foreign born, but the action of Congress has made that immaterial here.

The circumstances which we have recited shed much light on what Congress intended by "the body of lands known as Annette Islands." The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location. The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation. They had done much for themselves and were striving to do more. Evidently Congress intended to conform its action to their situation and needs. It did not reserve merely the site of their village, or the island on which they were dwelling, but the whole of what is known as Annette Islands, and referred to it as a single body of lands. This, as we think, shows that the geographical name was used, as is sometimes done, in a sense embracing the intervening and surrounding waters as well as the upland—in other words, as descriptive of the area comprising the islands.

This conclusion has support in the general rule that statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians. *Choate v. Trapp*, 224 U. S. 665, 675, and cases cited. And it has further support in the facts that, save for the de-

---

[1] House Ex. Docs., 50th Cong., 2d sess., vol. 10, p. cii; House Mis. Docs., 52d Cong., 1st sess., vol. 50, part 9, pp. 27–29, 188.

fendan.' conduct in 1916, the statute from the time of its enactment has been treated, as stated in the opinion of the Alaska court, by the Indians and the public, as reserving the adjacent fishing grounds as well as the upland, and that in regulations prescribed by the Secretary of the Interior on February 9, 1915, the Indians are recognized as the only persons to whom permits may be issued for erecting salmon traps at these islands.

These views are decisive of the suit and sustain the decree below.

*Decree affirmed.*