The PEOPLE OF the VILLAGE OF GAMBELL, an Alaskan Native IRA Association, and the People of the Village of Stebbins, an Alaskan Native IRA Association, Plaintiffs-Appellants,

v.

William CLARK *, Secretary of the Interior and the United States Department of Interior, Defendants-Appellees

and

Arco Alaska, Inc., et al., Defendants-Appellees.

Nos. 83–3735X, 83–3781.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1983.

Decided Nov. 2, 1984.

---

* William Clark is substituted for James G. Watt as Secretary of the Interior pursuant to Fed.R. App.P. 43(c).

Donald Cooper, Anchorage, Alaska, for plaintiffs-appellants.

David C. Shilton, Dept. of Justice, Brice M. Clagett, Covington & Burling, Washington, D.C., for defendants-appellees.

Before BROWNING, Chief Judge, HUG, Circuit Judge, and REED,** District Judge.

BROWNING, Chief Judge:

The appellee Secretary of Interior offered to sell leases for about 2.4 million acres of land in the Norton Sound Basin off the western shore of Alaska for oil and gas exploration under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356. Appellee oil companies submitted bids for these leases. Appellants, the People of the Village of Gambell and the People of the Village of Stebbins (Alaska Native Indian Reorganization Act Associations composed of residents of two towns on Norton Sound) brought this action to enjoin the sale. The district court denied appellants' motion for preliminary injunction and granted the Secretary's motion for summary judgment. This appeal followed.

Appellants argue that oil and gas development without their consent is barred because it will adversely affect their aboriginal right to subsistence hunting and fishing. Alternatively, they contend the lease sale failed to satisfy the procedural requirements of section 810 of the Alaska National Interest Lands Conservation Act (Conservation Act), 16 U.S.C. § 3120, providing special protections for subsistence uses in Alaska.

The district court held that neither appellants' aboriginal hunting and fishing right nor section 810 of the Conservation Act extend to waters over the outer continental shelf outside the territorial boundaries of the State of Alaska.

We hold that if appellants had an exclusive aboriginal right to hunt and fish in offshore areas adjacent to Alaska, that right was extinguished by the Alaska Native Claims Settlement Act (Claims Settlement Act), 43 U.S.C. §§ 1601–1628.[1] We further hold, however, that section 810 of the Conservation Act does apply to outer continental shelf waters in Norton Sound, and remand to the district court for determination of the proper remedy.

I.

Appellants argue that oil and gas exploration and development in Norton Sound conflicts with their asserted aboriginal right to hunt and fish in these waters and concomitant right to the minerals of the outer continental shelf underlying the Sound.

** Honorable Edward C. Reed, Jr., United States District Judge, District of Nevada, sitting by designation.

1. We assume rather than deciding that appellants had an aboriginal right to hunt and fish in the waters of Norton Sound above the lands involved in the lease-sale. Since we conclude any such rights were extinguished by the Claims Settlement Act, we also do not decide whether they would be extinguished by the Outer Continental Shelf Lands Act as well.

Aboriginal title or right is a right of exclusive use and occupancy held by Natives in lands and waters used by them and their ancestors prior to the assertion of sovereignty over such areas by the United States. These rights are superior to those of third parties, including the states, but are subject to the paramount powers of Congress. *See Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 667–69, 94 S.Ct. 772, 777–78, 39 L.Ed.2d 73 (1974); *United States v. Santa Fe Pacific R.R.,* 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941). Aboriginal rights based on occupation and use are entitled to the protection of federal law even when they are not formally recognized as ownership by treaty or statute, *Santa Fe,* 314 U.S. at 347, 62 S.Ct. at 252, but such unrecognized aboriginal rights can be extinguished by Congress without compensation. *See Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 279–85, 288–89, 75 S.Ct. 313, 317–20, 321–22, 99 L.Ed. 314 (1955); *United States v. Dann,* 706 F.2d 919, 922 n. 1 (9th Cir. 1983), *cert. granted,* — U.S. —, 104 S.Ct. 2693, 81 L.Ed.2d 362 (1984); *Wahkiakum Band v. Bateman,* 655 F.2d 176, 180 (9th Cir.1981); *United States v. Atlantic Richfield Co.,* 612 F.2d 1132, 1134 (9th Cir.1980). Congress's intention to extinguish must be clear; it will not be lightly implied. *See United States v. Santa Fe Pacific R.R. Co.,* 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941); *United States v. Dann,* 706 F.2d at 928–29; *United States v. Gemmill,* 535 F.2d 1145, 1147 (9th Cir.1976).

Appellees argue the Claims Settlement Act extinguished whatever aboriginal rights the Natives may have held in Norton Sound. The Claims Settlement Act arose out of a series of events beginning with passage of the Alaska Statehood Act in 1958. When Alaska became a state, nearly all its territory was federal land. The Statehood Act granted the new state the right to select over 100 million acres for state ownership. However, the state agreed by section 4 of the act to "disclaim all right and title ... to any lands or other property (including fishing rights) [of Alaska Natives]...." Pub.L. 85–508, 72 Stat. 339, 339 (1958). The state selected large areas of federal land and made application for patents for the land. The Natives claimed aboriginal title to much of the same territory. The discovery of oil on the North Slope in the 1960's exacerbated this conflict. These conflicting claims hindered both development and protection of Native and national interests in Alaska. In 1966 Secretary of Interior Stewart Udall "froze" all public land transactions in Alaska pending resolution of the conflicting claims. In 1971 Congress passed the Claims Settlement Act in an effort to accommodate in a rational manner the interests of the state, Native groups, conservationists, and potential developers, including the oil companies. *See generally,* H.R.Rep. No. 1045, 95th Cong., 2d Sess., pt. I at 188–89 (1978); S.Rep. No. 405, 92d Cong., 1st Sess., pt. I at 71–78 (1971).

The heart of the Claims Settlement Act was the extinguishment of Native claims based on aboriginal right in return for a grant to the Natives of $962,500,000 and 40,000,000 acres of land. *United States v. Atlantic Richfield,* 612 F.2d 1132, 1134 (9th Cir.1980). Unquestionably it was the purpose of the Claims Settlement Act to extinguish the aboriginal claims of Alaska Natives.[2] The question is whether the extinguishment provision applies to lands on the outer continental shelf adjacent to the Alaskan land mass and to waters over such lands.

Our inquiry begins with the statutory language. The critical language is found in Section 4(b) of the Act, 43 U.S.C. § 1603(b):

All aboriginal titles, if any, and claims of aboriginal title *in Alaska* based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any

---

**2.** "Native" is defined in the Act as "a citizen of the United States who is a person of one-fourth degree or more Alaska Indian (including Tsims- hian Indians not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood, or combination thereof." 43 U.S.C. § 1602(b).

aboriginal hunting or fishing rights that may exist, are hereby extinguished. (emphasis added).

The statute also states: "there is an immediate need for a fair and just settlement of all claims by Natives ... based on aboriginal land claims," and "the settlement should be accomplished rapidly, with certainty, [and] ... without litigation ...." 43 U.S.C. § 1601(a), (b).

The argument that aboriginal title in outer continental shelf lands and waters is not extinguished rests entirely upon use in section 4(b) of the phrase "in Alaska" to identify the location of the titles and claims of title to be extinguished.

We believe Congress used the phrase "in Alaska" in this context to mean the geographic region, including the contiguous continental shelf and the waters above it, and not merely the area within the strict legal boundaries of the State of Alaska. This is not an uncommon usage. Indeed, the Norton Sound, at issue here, is described in *Webster's New Geographical Dictionary* (1972 ed.) as a "large inlet of NE Bering Sea, *in W Alaska* ...." (emphasis added). As indicated in Part II of this opinion, nine years later, when Congress adopted the Alaska National Interest Lands Conservation Act, 16 U.S.C.

§§ 3101–3233 (Conservation Act), to complete the land allocation process initiated by the Statehood and Claims Settlement Acts, Congress used the words "in Alaska" to refer to areas of the outer continental shelf. Section 1001 of the Conservation Act, 16 U.S.C. § 3141, refers to "all Federal lands (other than submerged lands on the Outer Continental Shelf) in Alaska ...." During debates on the Conservation Act, the phrase "in Alaska" was used on numerous occasions to include the outer continental shelf. *See e.g.*, 125 Cong.Rec. 9900, 11,128 (1979) (statements of Rep. Udall); *id.* at 9907 (statement of Rep. Young).

The possibility of two meanings of the phrase "in Alaska" renders the provision ambiguous, justifying reference to the legislative history. That history makes it clear that Congress intended to extinguish aboriginal fishing and hunting rights in outer continental shelf waters contiguous to the State of Alaska.

Congress repeatedly enjoined those who were to implement the statute to interpret the extinguishment section broadly to accomplish a complete and final settlement of aboriginal claims and avoid further litigation of such claims.[3] Claims of aboriginal title to submerged lands, both inland and

---

**3.** Relevant statements from the legislative history are quoted in *United States v. Atlantic Richfield Co.*, 612 F.2d 1132, 1136 (9th Cir.1980):

The House report stated,
Section 4 extinguishes all aboriginal titles in Alaska, and all claims based thereon,
and
The section extinguishing aboriginal titles and claims based on aboriginal title is intended to be applied broadly, and to bar any further litigation based on such claims of title.
H.R.Rep. No. 523, 92d Cong., 1st Sess. 6, 8 *reprinted in* [1971] U.S.Code Cong. & Ad.News 2196, 2198. The Senate report stated that the objective of the legislation was to avoid
a myriad of lawsuits which cannot provide justice to any of the parties involved but which may be expected to increase the existing antagonisms between Native people and other Alaskans.
S.Rep. No. 405, 92d Cong., 1st Sess. 73 (1971).
The Conference Committee report[7] stated,
It is the clear and direct intent of the conference committee to extinguish *all* aborigi-

nal claims and *all* aboriginal land titles, if any, of the Native people of Alaska and the language of settlement is to be broadly construed to eliminate such claims and titles as any basis for any form of direct or indirect challenge to land in Alaska.
Conf.Rep. No. 40, *reprinted in* [1971] U.S.Code Cong. & Ad.News 2253 (emphasis in original).
The statements of former Justice Arthur Goldberg, attorney for the Alaska Federation of Natives, before Congress in 1969 also support the district court's conclusion. Goldberg, under questioning by Senator Stevens of Alaska, said, "The position that the Natives have taken is that they are prepared for an extinguishment of anything that is based upon aboriginal title." *Alaska Native Land Claims: Hearings on S. 1830 Before the Senate Comm. on Interior and Insular Affairs*, 91st Cong., 1st Sess. 300–01 (1969).

---

**7.** The House and Senate Conference Reports are identical. S.Conf.Rep. No. 481, 92d Cong., 1st Sess. (1971); H.R.Conf.Rep. No. 746, 92d Cong., 1st Sess. (1971) [Hereinafter cited as Conf.Rep.]

offshore, were expressly included in the extinguishment provision, as were "any aboriginal hunting or fishing rights." The needs of the Natives for subsistence hunting and fishing were considered in determining the amount of land granted the Natives, *see, e.g.*, H.R.Rep. No. 523, 92nd Cong., 1st Sess. 5, *reprinted in* 1971 U.S. Code Cong. & Ad.News 2192, 2195; the land was granted, in part, "in lieu of subsistence hunting and fishing rights," 117 Cong.Rec. 36864 (1971) (Rep. McClure).[4]

Appellants' claim of aboriginal title rests upon immemorial use for hunting and fishing extending far to sea. They assert:

Factually, no aboriginal group has ever used water and ice as intensely as have the Eskimos. For about half the year, water up to 65 miles from the Arctic coast is frozen solid. The resulting ice areas resemble the tundra, and during this period the Eskimos treat the ice as a mere extension of the land. They set up camps on the ice. They build roads on it. And, most importantly, they hunt and fish on it. R. Nelson, *Hunters of the Northern Ice* (1969).... Eskimos have relied on the sea to provide them with most of their necessities. They have relied on the oceans to provide them with food, clothing, fuel, and the basic material for making hunting equipment such as kayaks and harpoons. *Id.;* N. Chance, *The Eskimo of North Alaska* 9 (1966).

Because ice areas are not physically different from land during long periods of the year, and because Eskimos have generally relied on the oceans for most of their food, fuel, and clothing, they have not traditionally recognized sharp distinctions between land and water.

Simply stated, the sea is so central to the life of an Eskimo that s/he recognizes no distinctions between the two.... K. Josephson, *Alaska and the Law of the Sea: Use of the Sea by Alaska Natives—A Historical Perspective*, 91 (1974).

Appellants' Opening Brief 27–8. Appellees do not dispute this assertion.

The Final Environmental Impact Statement (FEIS) for the Norton Sound lease sale describes the subsistence way of life as a "continuation of traditional patterns continuous for several centuries." United States Department of Interior, Final Environmental Impact Statement, OCS Proposed Oil & Gas Lease Sale Norton Sound 47 (1982). *See also id.* at xii (subsistence activities "passed on through countless generations."). The Natives' dependence on hunting, whaling, and fishing extending 20–30 miles off shore is described in detail for each of the affected villages. *Id.* at 47–53 & Graphics 2A, 2B, 2C.

Congress could not have been unaware of such widely known facts of Native Alaskan life and appellants do not argue to the contrary. Mr. Eben Hopson, a witness from Point Barrow, Alaska, reminded the Senate Interior and Insular Affairs Committee: "As far as hunting on the sea is concerned that is continually being used on a year around basis by the Eskimo people, and the same holds true wherever you find an Eskimo village along the coast." *Alaska Native Land Claims: Hearings on S. 1830 Before Senate Comm. on Interior and Insular Affairs*, 91st Cong., 1st Sess., pt. II at 335 (1969) [hereinafter *Senate Hearings 1969*]. *See also Alaska Native*

---

**4.** Rep. McClure, a member of the Committee on Interior and Insular Affairs, stated:

... The settlement of this acreage of land is in lieu of other rights, and the bill in specific terms removes hunting and fishing rights. The subsistence lands that may be selected, after the village lands are selected and after the statehood lands are selected, are in lieu of subsistence hunting and fishing rights, and the only hunting and fishing rights they will have are in connection with whatever lands are selected by them under the provisions of the bill.

\* \* \* \* \* \*

... The rights for hunting and fishing will be not rights, but whatever is granted to them as a matter of charity or a matter of generosity on the part of the State or the Federal Government. I think we should know that is one of the reasons why the acreage that is granted is as large as it is.

Appellants are two of the villages qualified by section 1610(b) of the Act to receive land benefits under section 1613(a) and (b).

*Land Claims: Hearings on H.R. 13142, H.R. 10193 and H.R. 14212 Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs,* 91st Cong., 1st Sess., pt. II at 401–02 (1969) [hereinafter *House Hearings 1969*]; *Alaska Native Land Claims: Hearings on S. 35, S. 835 and S. 1571 Before the Senate Comm. on Interior and Insular Affairs,* 92d Cong., 1st Sess., pt. I at 168, 345 (1971) [hereinafter *Senate Hearings 1971*].

Aboriginal fishing and hunting rights are precisely the kind of rights Congress wished to extinguish. Nothing in the legislative history suggests that Congress intended to extinguish such rights in ocean waters within three miles of land but preserve them in the waters beyond. On the contrary, the only directly pertinent legislative material strongly suggests Congress intended to extinguish aboriginal fishing rights in outer continental shelf waters as well.

Early versions of the Act contained no reference to either offshore lands or fishing and hunting rights. *See* S. 2906, 90th Cong.2d Sess. § 501 (1968) (extinguishing "all claims against the United States based upon aboriginal right, title, use, or occupancy of lands in Alaska . . . ."); S. 1830, 91st Cong., 1st Sess. § 3(a) (1969) (similar language). During Senate hearings in 1969 John Pickering, representative of the Western Oil and Gas Association, pointed out that some of the Native claims "purport to cover waters in addition to land areas" and "to effectuate a complete settlement, the claims should be extinguished as to water, as well as to land, areas." Mr. Pickering suggested this was true "for submerged areas beneath navigable waters in particular," and identified these as including "submerged areas beneath navigable waters [title over which was vested] in the State of Alaska under the grant made to it by the Submerged Lands Act (67 Stat. 29) as made applicable by the Statehood Act (72 Stat. 343), *or in the United States under the Outer Continental Shelf Lands Act* (67 Stat. 462)." *See Senate Hearings 1969, supra,* pt. I at 140, 144, 149 (emphasis added). "In view of this," Mr. Pickering

stated, "it would be unfortunate if the legislation overlooked settling the Native claims to waters and thereby left open the possibility that such claims might be asserted to water areas in the future." *Id.* at 144. To include such areas, Mr. Pickering suggested the extinguishment provision be amended to apply to claims based on use or occupancy not only of lands but also of "waters, and submerged areas in Alaska." *See id.* at 149. The State of Alaska recommended the same language. *See id.,* pt. II at 241. The present language of Section 4 ("including submerged lands underneath all water areas both inland and offshore") was inserted in Senate bills following this hearing.

These events strongly suggest that the reference to "submerged lands" was intended to include lands on the outer continental shelf contiguous to Alaska, and that the general reference to Alaska (as distinguished from the State of Alaska) was not regarded as confining the reach of the extinguishment provision to the three-mile limit.

The express reference in Section 4(b) to "aboriginal hunting or fishing rights" probably also had its genesis in the hearings before the 91st Congress. Arthur J. Goldberg, former Justice of the Supreme Court, appeared before the Senate Committee on behalf of the Alaska Federation of Natives, principal representative of the Natives before Congress. Senator Stevens of Alaska asked Mr. Goldberg whether the Natives agreed that aboriginal fishing and hunting rights should be extinguished. After a rather confusing exchange, Senator Stevens said:

> [W]e are talking about a bill to settle the property claims of the Alaska Native people, not just the land claims, a bill to settle the property rights, including land, and I hope that this bill will be viewed in that manner because I would not want to have to come back here a few years from now and try to get a bill to settle the nonland property claims.

*Senate Hearings 1969, supra,* pt. II at 299–301.

Mr. Goldberg replied:

The position that the Natives have taken is that they are prepared for an extinguishment of anything that is based upon aboriginal title.

*Id.* at 301. The Alaska Federation of Natives further clarified Mr. Goldberg's response in a supplemental statement which agreed that the settlement should extend to all claims "founded upon aboriginal title or use and occupancy of lands, including claims relative to fishing rights ...." *Id.*

During these same hearings, the National Wildlife Federation suggested the bill be strengthened by adding "including any aboriginal hunting or fishing rights that may exist" to the extinguishment provision. *Id.* at 526. This phrase was added without change to the Senate bill and eventually included in the version of the act adopted by Congress.

These witnesses presented similar testimony before the House Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs. The representatives of the Alaska Federation of Natives (AFN) reiterated their view that the act should be a "full and final extinguishment of any and all claims against the United States based upon aboriginal right ...." *See House Hearings 1969,* Pt. I, *supra,* at 52. *See also id.* at 265–68. The Governor of the State of Alaska and the representatives of the Western Oil and Gas Association repeated their urgings that the extinguishment section address claims to waters and submerged areas. *See id.* at 138, 154, 310, 312–13, 318. And the National Wildlife Federation recommended to the House Committee addition of the identical phrase to cover aboriginal hunting and fishing rights that it suggested to the Senate Committee. *Id.* at 292.

No legislation passed the 91st Congress, but bills introduced in the 92d Congress reflected this testimony. At least one Senate bill specifically extinguished claims to offshore areas and hunting and fishing rights with language essentially identical to the present section 4(b). *See* S. 35, 92d Cong., 1st Sess. § 4(a) (1971). Similar language in a House bill referred to "alleged aboriginal hunting and fishing rights that may exist." *See* H.R. 3100, 92d Cong., 1st Sess. § 3(b) (1971).

Only brief hearings were conducted by the House and Senate committees on these and other bills in 1971. Representatives of the Western Oil and Gas Association urged the Senate and House to approve bills with extinguishment sections referring to water, offshore areas, and hunting and fishing rights and criticized bills that failed to include specific language extinguishing such claims. *See Senate Hearings 1971 supra,* pt. II at 578, 581, 583; *Alaska Native Land Claims: Hearings on H.R. 3100, H.R. 7039, and H.R. 7432 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs,* 92d Cong., 1st Sess. 353, 354, 356–57 (1971) [hereinafter *House Hearings 1971*]. The AFN explained before the Senate Committee that its position "on the major provisions of the settlement, as well as most of the details, remains virtually the same as it was in our prior appearances before this committee." *Senate Hearings 1971, supra,* pt. I at 306. The National Wildlife Federation stated again its belief that the settlement should extend to "hunting, fishing, and trapping rights." *Id.* at 386. *See also House Hearings 1971, supra,* at 342.

The Senate passed a bill containing an extinguishment section referring to offshore submerged lands and to hunting and fishing rights. Submerged offshore areas were not specifically extinguished in the House-passed bill, but aboriginal hunting and fishing rights were. The conference committee adopted the broader and more explicit language of the Senate bill, stating the language was "in substance, the same as the language of the Senate amendment." H.Conf.Rep. No. 746, 92d Cong., 1st Sess. 40, *reprinted in* 1971 U.S.Code Cong. & Ad.News, 2247, 2253.

This summary of the history of section 4(b) demonstrates that Congress chose to adopt broad language to extinguish all

claims made by Alaska Natives based upon aboriginal right, specifically including claims to hunting and fishing rights in off-shore waters above the outer continental shelf.

■ Based upon the language of section 4(b) of the Claims Settlement Act, taken as a whole, the mandate from Congress to construe the provision broadly to extinguish all aboriginal claims, and the legislative history indicating a specific purpose to extinguish aboriginal hunting and fishing rights, including those in coastal waters, and specifically in outer-continental-shelf waters, we conclude that appellants' claims to an aboriginal right to hunt and fish in Norton Sound were extinguished.

## II.

We turn to appellants' contention that the lease sale failed to satisfy the procedural requirements of section 810 of the Alaska National Interest Lands Conservation Act (Conservation Act), 16 U.S.C. § 3120, a claim rejected by the district court on the ground that this statutory provision does not apply to the outer continental shelf.

Title VIII of the Conservation Act, of which section 810 is a part, seeks to preserve the opportunity of rural residents of Alaska to take fish and wildlife for their subsistence. As one means of furthering this purpose, section 810 provides that in determining whether to lease or otherwise permit the disposition of public lands the head of the federal agency having primary jurisdiction of such lands shall evaluate the effect of the proposed action on subsistence uses. No action is to be taken which would significantly restrict subsistence uses unless the head of the agency first satisfies certain procedural conditions, including notice and hearing, and determines that the proposed restriction of subsistence uses is necessary, that the minimal amount of "public lands" are involved, and that reasonable steps have been taken to minimize the adverse impact on subsistence uses.

■ Section 810 applies to "public lands." The term "land" is defined as "land, waters, and interests therein." Section 102(1), 16 U.S.C. § 3102(1). The term "public lands" is defined as "land situated *in Alaska.*" Section 102(3), 16 U.S.C. § 3102(3) (emphasis added). As in the construction of the Claims Settlement Act, the question in construing the Conservation Act is whether the limitation "in Alaska" in this definition of "public lands" excludes the outer continental shelf and its covering waters. Our conclusion is the same under both statutes: outer continental shelf lands and waters contiguous to the State of Alaska are included.

As we have said, a geographic term such as "in Alaska" may be used in either a general or technical sense, and reference to the legislative history to resolve the ambiguity is appropriate. *See Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918).

During the House debates the term "in Alaska" was used in its general sense. Representative Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs, and manager of the bill on the floor, referred to outer continental shelf lands as "in Alaska." 125 Cong.Rec. 9900, 11,128 (1979). So too did Representative Don Young of Alaska, a member of both the Interior Committee and the Subcommittee on General Oversight and Alaska Lands. *See id.* at 9907. Other congressmen referred to "Alaska's" oil resources in terms that necessarily included oil reserves beneath the outer continental shelf. *See id.* at 11,174 (Rep. Huckaby); *id.* at 9893 (Rep. Vento).

In addition to this support for a nontechnical usage of the phrase "in Alaska" to include the outer continental shelf lands and waters, the record of legislative consideration of the Conservation Act contains convincing evidence that Congress intended to include these areas within the reach of section 810.

Appellants make a compelling argument that the provisions of Title VIII of the Conservation Act protecting subsistence uses were intended to have the same territorial scope as provisions of the earlier

Claims Settlement Act extinguishing Native hunting and fishing rights. The two statutory provisions are clearly related. When Congress adopted the Claims Settlement Act it was aware that extinguishing Native rights might threaten subsistence hunting and fishing by Alaska Natives. The Senate version of the Claims Act included provisions directing the Secretary to protect subsistence uses on public lands. The Conference Committee eliminated this provision, but the Committee made it clear that it did so only because it concluded subsistence resources should be protected by the Secretary of Interior through the exercise of existing administrative authority. The Committee wrote: "The Conference Committee expects both the Secretary and the State to take any action necessary to protect the subsistence needs of the Natives." *See* H.Conf.Rep. No. 746, 92d Cong., 1st Sess. 37, *reprinted in* 1971 U.S. Code Cong. & Ad.News 2247, 2250. Title VIII of the Conservation Act was enacted because the Secretary and the state failed to heed Congress's admonition. *See* S.Rep. No. 413, 96th Cong., 1st Sess. 230–31, *reprinted in* 1980 U.S.Code Cong. & Ad. News, 5070, 5174–75; S.Rep. No. 1300, 95th Cong., 2d Sess. 195–96 (1978); H.R. Rep. No. 1045, 95th Cong., 2d Sess., pt. I at 183–84 (1978); 126 Cong.Rec. 29278 (1980) (Cong. Udall); 125 Cong.Rec. 9904 (1979) (Cong. Udall). It is a reasonable assumption that Congress intended the preference and procedural protections for subsistence uses mandated by Title VIII of the Conservation Act to be co-extensive with the extinguishment of aboriginal rights that made those measures necessary.

Congress's intention to protect subsistence uses by rural residents of Alaska is repeatedly and strongly stated in the stat-ute itself. It was a stated general purpose of the Conservation Act "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." Section 101(c), 16 U.S.C. § 3101(c). Congress found that continuation of the opportunity of rural Alaskans to make subsistence use of fish and wildlife "is essential to [their] existence." Section 801(1), 16 U.S.C. § 3111(1). Congress further found that "to fulfill the policies and purposes of the [Claims Settlement Act] and as a matter of equity, it is necessary ... to protect and provide the opportunity for continued subsistence uses on the public lands...." Section 801(4), 16 U.S.C. § 3111(4). It is Congress's stated policy that "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands...." Section 802(1), 16 U.S.C. § 3112(1). The stated purpose of Title VIII in particular "is to provide the opportunity for rural residents engaged in a subsistence way of life to do so." *Id.*

Congressional reports and debates echo these views.[5] It is clear Congress's concern included all rural Alaskans,[6] and, as we have seen, reliance by coastal villagers upon hunting and fishing in waters and on the ice over the outer continental shelf was well known.[7] In strikingly similar circumstances, the Supreme Court has twice given an expansive and non-technical interpretation to geographical terms to achieve Congress's apparent purpose to protect native fisheries. *Hynes v. Grimes Packing Co.,* 337 U.S. 86, 110–16, 69 S.Ct. 968, 982–86, 93 L.Ed. 1231 (1949); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918).

---

**5.** *See, e.g.,* S.Rep. No. 413, 96th Cong., 1st Sess. 230–33, 267–68, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5070, 5174–77, 5211–12; S.Rep. No. 1300, 95th Cong., 2d Sess. 195–96 (1978); H.R.Rep. No. 1045, Pt. I., 95th Cong., 2d Sess. 181–84, 187 (1978); 126 Cong.Rec. 29,278 (1980); 125 Cong.Rec. 9904–05 (1979).

**6.** *See* S.Rep. No. 413, 96th Cong., 1st Sess. 268–69, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5070, 5212–13; S.Rep. No. 1300, 95th Cong., 2d Sess. 220 (1978); 126 Cong.Rec. 29278–79 (Cong. Udall).

**7.** See pp. 6–8, *supra. See also Inclusion of Alaska Lands in National Park, Forest, Wildlife Refuge, and Wild and Scenic Rivers Systems, Hearings on H.R. 39, H.R. 1974, H.R. 2876, H.R. 5505, et al., H.R. 1454, H.R. 5605, & H.R. 8651, Before the Subcommittee on General Oversight and Alaska Lands of the House Committee on Interior and Insular Affairs,* 95th Cong., 1st Sess., pt. XIII at 468, 484, 487, 510–528 (1977) (report discussing Arctic Slope subsistence uses of resources of the ocean and sea ice).

There are other indications of a Congressional intent that section 810 apply to outer continental shelf waters. For example, as originally proposed the subsistence provisions applied only to lands in conservation units established by what are now Titles II through VII of the Conservation Act. *See* H.R. 39, § 701(a), (b), 95th Cong., 1st Sess. (1977). The boundaries of these units were fixed by maps to be approved with the legislation, *see id.* § 1(c), and generally would not have included outer continental shelf areas. In the course of legislative proceedings, the coverage of Title VIII was extended beyond the boundaries of the conservation units to include all public lands in Alaska. *See* 16 U.S.C. §§ 3102(3), 3111, 3112. The boundaries of conservation units remained tied to maps, as they are in the Act as passed. *See* 16 U.S.C. § 3103(a). At the same time, Congress amended the savings clause, 16 U.S.C. § 3125, identifying existing statutes that were not to be considered modified or replaced by the passage of Title VIII, to include the Fishery Conservation and Management Act of 1976, in which the United States asserts exclusive jurisdiction over a fishery conservation zone that extends 200 miles offshore.[8] *See* 16 U.S.C. § 1811–12. Although other explanations may be possible, this change suggests Congress understood that Title VIII applied to outer continental shelf waters.

A second example: At least one of the national wildlife refuges created by the Conservation Act (the Yukon Delta National Wildlife Refuge) has within its borders portions of the outer continental shelf and overlying waters. *See* 48 Fed.Reg. 7890, 8017 (Feb. 24, 1983). Unless these lands and waters are included in Title VIII the protection that title provides for subsistence uses would not apply to the entire Wildlife Refuge though one of the specified purposes of the Refuge is "to provide ... the opportunity for continued subsistence uses by local residents." *See* Conservation Act, Pub.L. No. 96–487, § 303(7)(B)(iii), 94 Stat. 2371, 2392.

The most compelling reason for resolving the ambiguous language of Title VIII in favor of coverage of outer continental shelf lands and waters is that Title VIII was adopted to benefit the Natives. Under a familiar rule of statutory construction doubtful language should be construed to further that purpose. *See Alaska Pacific Fisheries v. United States*, 248 U.S. at 89, 39 S.Ct. at 42; *United States v. Dann*, 706 F.2d 919 at 931, quoting *United States v. Santa Fe Pacific R.R.*, 314 U.S. 339, 353–54, 62 S.Ct. 248, 255–56, 86 L.Ed. 260 (1941); *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251, 1257 n. 6 (9th Cir.1983). Congress was specifically advised that this rule of construction would be applied to Title VIII and other subsistence provisions though not to the rest of the Act. In the course of a detailed discussion of the proposed legislation submitted to the House, Congressman Udall said with specific reference to Title VIII:

> While the [Conservation Act] obviously is not Indian legislation in its entirety, the subsistence title and the other subsistence related provisions are. And under well-recognized canons of statutory construction, any ambiguities in the title and other provisions must be resolved in favor of the Alaska Native people.
>
> This result is also consistent with the Congressional policy established by section 802(1) that the management of the public lands shall cause the least adverse impact possible on rural residents who depend upon subsistence uses.

126 Cong.Rec. 29,279 (1980). *See also* 125 Cong.Rec. 9904 (1979).

As appellees have demonstrated, reasonable arguments can also be made for a narrow construction of section 810. We find them unpersuasive, however, in light of the evidence of a contrary legislative intent and the admonition that ambiguities in Title VIII "must be resolved in favor of the Alaska Native people."

Appellees rely particularly upon reference to the Conservation Act as a "land bill" that would not inhibit development of oil and gas resources on the outer continental shelf. *See e.g.*, 125 Cong.Rec. 11,128

---

8. *Compare* H.R. 39, § 701(g), 95th Cong., 1st Sess. (Comm.Print Oct. 12, 1977) *with* H.R. 39, as amended, § 713, 95th Cong., 2d Sess. (1978).

(1979) (statement of Rep. Udall); *id.* at 11,170 (statement of Rep. Emery). These statements were made in response to arguments that the Conservation Act "locked up" Alaskan resources. The statements did not refer to Title VIII but rather to Titles II—VII which add lands to the National Park System and other conservation units. Oil and gas exploration and production in fact would be precluded in some of these conservation units and probably in others. Congressmen Udall and Emery were making the point that these conservation units did not include the adjacent outer continental shelf and therefore creation of such units did not preclude oil and gas development on the shelf. *See also* S.Rep. No. 413, 96th Cong., 1st Sess. 417, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 5357.

These statements are not inconsistent with the position that Title VIII includes the outer continental shelf since nothing in Title VIII precludes oil and gas development in the areas to which it applies. The only restrictions imposed by section 810 are procedural ones. Once these are complied with, "the head of the appropriate Federal agency may manage or dispose of public lands under his primary jurisdiction for any of those uses or purposes authorized by

this Act or other law." Section 810(d), 16 U.S.C. § 3120(d). In the words of the Senate Report: "[O]nce the requirements of the section are satisfied and incorporated into existing land use planning processes the proposed action may proceed even though its effect may be adverse to subsistence uses." S.Rep. No. 413, 96th Cong., 1st Sess. 234, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 5178.[9]

We conclude that the ambiguous language of the Conservation Act should be interpreted to include outer continental shelf lands and waters within the coverage of section 810.

### III.

Appellants ask that the lease sale be voided because the Secretary has not complied with the requirements of section 810. Appellees contend the Secretary has substantially complied with the requirements of the section, albeit acting under other statutes, and if he has not, the proper remedy is to maintain the status quo unless and until the Secretary complies with section 810, citing *California v. Watt*, 683 F.2d 1253, 1266 (9th Cir.1982), *reversed on other grounds*, —— U.S. ——, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).

---

**9.** The response to other arguments against a broad interpretation of section 810 may be stated briefly.

Rejection by Congress of proposals to extend the coverage of conservation units to areas beyond the territorial sea (*See, e.g.,* S.Rep. No. 1300, 95th Cong., 2d Sess. 149–50 (1978); 124 Cong.Rec. 18025–27 (1979)) is not relevant to the interpretation of Title VIII for the reason mentioned: inclusion in a Title II–VII conservation unit might bar future development, but inclusion in Title VIII would not. Moreover, the "complexity of jurisdictions" that would have resulted from extension of conservation units seaward, *id.,* would not occur under Title VIII since this title contemplates administration of both state and federal lands by the state for the purpose of this section (§ 805(d), 16 U.S.C. § 3115(d)). *See also* 126 Cong.Rec. 29280 (1980).

Other federal statutes applicable in one fashion or another to resource management on the outer continental shelf are neither so comprehensive nor inconsistent with Title VIII as to support an inference that Title VIII does not apply to these areas. Section 810(b) provides

expressly for situations in which both Title VIII and the National Environmental Protection Act, 42 U.S.C. § 4321, *et seq.,* will be applicable. Other statutes of general applicability mentioned by appellees (the Endangered Species Act, 16 U.S.C. § 1531–43; the Coastal Zone Management Act, 16 U.S.C. §§ 1451–54; and the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–56) pursue different goals by different means than Title VIII of the Conservation Act, and may be applied consistently with Title VIII.

Appellees argue that subjecting outer continental shelf lands and waters to certain provisions of the Act other than Title VIII in which the term "public lands" is used would provide "absurd and unintended consequences." We have examined the provisions relied upon by appellees and are satisfied the interpretative difficulties they suggest are resolvable. We need not examine them in detail here, however, since in any event Congress was aware that a standard of interpretation requiring resolution of ambiguities in favor of the Natives would be applicable only to Title VIII and other subsistence provisions of that Act. *See* 126 Cong.Rec. 29,279 (1980); 125 Cong.Rec. 9904 (1979).

These arguments raise factual and legal issues that have not been but should be considered initially by the district court.

 Appellants' request for attorneys' fees is denied. Assuming appellants are prevailing parties we cannot say the government's position was not "substantially justified." *See Rawlings v. Heckler*, 725 F.2d 1192, 1196 (9th Cir.1984); *Foster v. Tourtellotte*, 704 F.2d 1109, 1112–13 (9th Cir.1983).

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.